**SIERRA CLUB, a non-profit corporation, et al., Plaintiffs,**

v.

**John A. VOLPE, Secretary of Transportation, individually and in his official capacity, et al., Defendants.**

**No. C-72-919.**

United States District Court,
N. D. California.

Dec. 6, 1972.

Charles D. Chalmers, of Petty, Andrews, Olsen, Tufts, Jackson & Sander, San Francisco, Cal., for plaintiffs.

Harry S. Fenton, Sacramento, Cal., John P. Horgan, San Francisco, Cal., Kingsly T. Hoegstedt, Sacramento, Cal., Norval Fairman, Robert R. Buell, and Donald M. Velasco, San Francisco, Cal., for defendants.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

Plaintiff, Sierra Club, and other conservation organizations, together with seven individuals, who allege that they reside in the general area of the freeway project hereinafter mentioned, bring this suit to restrain federal and California highway officials from proceeding with construction of the so-called Devil's Slide By-Pass Freeway project on the ground of failure to comply, as to the federal defendants, with the provisions of the Federal Aid Highway Act, 23 U. S.C. § 128, as amended, and the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347, hereinafter referred to as "NEPA", and, as to the state defendant via pendent jurisdiction, with the California Environmental Quality Act, Cal. Public Resources Code §§ 21000–21151, hereinafter referred to as "CEQA".

## BACKGROUND OF THE PROJECT

The Devil's Slide By-Pass project, hereinafter sometimes referred to as "the project", consists of a planned four lane freeway between the southerly limit of Pacifica, San Mateo County, California, on the north, and running thence southerly 6.3 miles to the Half Moon Bay Airport.

The project is part of a federal aid primary highway route, i. e., State Highway # 1, which runs from San Francisco on the north, thence southerly to the city of Half Moon Bay and points farther south. .

Some time prior to 1966, Highway # 1, northerly of the project, was reconstructed with federal aid as a six lane freeway from San Francisco to within about three miles of the southerly limit of Pacifica; the remaining three mile section through Pacifica to its southerly limit is still plain surface road as to which no freeway construction is presently planned.

Highway # 1, southerly of the project, i. e., from Half Moon Bay Airport to the City of Half Moon Bay, consists of thirteen miles of plain surface, two lane road which is presently under study, including preparation of an environmental impact statement, for future freeway re-construction with federal funding but, according to the state and federal defendants herein, as a separate project. No further freeway construction on Highway # 1, south of the city of Half Moon Bay, is now under consideration.

In addition to being a freeway reconstruction, the Devil's Slide By Pass is also intended, as its name implies, as a by pass of the present section of Highway #1 that runs along the Devil's

Slide coast line; the by pass reroutes that section through the San Pedro coastal mountains in order to avoid what has long been considered to be an unstable and dangerous condition of the Devil's Slide terrain.

This project was first conceived in 1958, and has been ever since in the planning stage. In August, 1960, a public hearing was held at Pacifica, apparently to comply with the Federal Highway Act, 23 U.S.C. § 128, which then required a public hearing by the state concerning the *economic* effects of the highway location prior to any federal funding; in December, 1960, the California Highway Commission adopted the route for the project and in September, 1963, a San Mateo County—State of California contract was entered into; in September, 1966, the federal highway agency granted *location* approval.

On August 23, 1968, Federal Aid Highway Act, 23 U.S.C. § 128, which up to that time had required public hearing concerning only *economic* effects of a highway location as a condition of federal funding, was amended to provide in effect that a state agency, submitting plans for federal highway projects, must certify that it had held, or afforded opportunity for, public hearings and had considered, not only the economic effects of a location, but also its "social effects" and its *"impact on the environment"*. (Emphasis added.)

On January 14, 1969, (about four months after the effective date of the amendment to § 128) FHA issued a Policy and Procedure Memorandum, PPM No. 20–8 (23 CFR App. A). That Memorandum, which was primarily designed to implement the § 128 Amendment, required certification by the state of public hearings concerning, not only location, but also the design of proposed highway projects and provided that, as to projects which had *not* received FHA design approval by January 14, 1969, (the date of the Memorandum), compliance with the design public hearing provision of the Memorandum would be re-

quired *unless* the state had requested FHA design approval within three years after the date of the state's original location public hearing (in our case the "location" public hearing had been held in August, 1960) ; but, that, as to projects which *had* received FHA design approval prior to January 14, 1969, then state certification of design public hearings, otherwise required by the Memorandum, would not be necessary.

It is admitted that no public hearings, within the meaning of § 128, as amended, have been held by the state since the route or location public hearing at Pacifica in August, 1960.

Both federal and state defendants contend, however, that the record in the pending case shows a grant of FHA "design approval" for the Devil's Slide project by October, 1968, i. e., about two months *after* the effective date of the § 128 amendment but also about two months before January 14, 1969, (the cut off date fixed by PPM 20–8) and that, therefore, no state certification of *design* public hearings was necessary in the case of the Devil's Slide project.

Plaintiffs, however, strongly dispute any FHA design approval in October, 1968, arguing that FHA took no such action at that time and quoting state defendant's division engineer as, in effect, admitting that no such design approval could have been given until at least August 21, 1969—about eight months after PPM 20–8. Plaintiffs also point out the absence of any showing by defendants of any request by the state for FHA design approval within three years of the original location approval of August, 1960.

On January 1, 1970, the National Environmental Policy Act of 1969, 42 U.S. C. § 4331(b) et seq. ("NEPA") became effective, requiring even more exacting procedures concerning environmental impact than had been required by the August 23, 1968, amendment to § 128 of the Highway Act.

Section 4332 of NEPA provides that the Congress authorizes and directs that "to the fullest extent possible" all agen-

cies of the federal government "shall . . . (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on —(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

On May 11, 1970, the President's Council on Environmental Quality (CEQ), created by the Act, issued *Interim* Guidelines (35 Fed.Reg. 7390, 5/12/70), interpreting and implementing NEPA and providing that "to the fullest extent possible", its requirements of § 4332(B) should be applied to federal actions "even though they arise from projects or programs initiated prior to NEPA", and adding that "even when it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program."

On November 24, 1970, FHA issued its own Interim Guidelines providing in effect that NEPA compliance would not be required on projects which had received "design approval" prior to February 1, 1971, (a cut off date about one year after the effective date of NEPA and about eight months after the Interim CEQ Guidelines) but that in lieu of such compliance the state must merely "review with the federal agency" certain classes of projects, e. g. new locations, which had been accorded design approval before January 1, 1971 (a cut off date one year after NEPA).

On March 23, 1971, an agency review of the project in question was made; an Environmental Fact Sheet was prepared to document that review by state and FHA officials, apparently pursuant to the "agency review" provision of FHA's Interim Guidelines of November 24, 1970; that Fact Sheet was approved by the FHA division engineer on April 28, 1971.

On April 23, 1971, Final CEQ Guidelines (36 Fed.Reg., p. 7724) were issued restating the Interim CEQ Guidelines of May 11, 1970, already noted above, with the one change that the language of the Interim Guidelines "to the fullest extent possible" was changed to read "to the maximum extent possible".

On August 24, 1971, Final FHA Guidelines, PPM 90–1 (23 CFR Pt. I App. A, 1970) were issued requiring NEPA compliance on projects receiving design approval after February 1, 1971, but not on projects receiving design approval between January 1, 1970 (the date of NEPA's enactment) and February 1, 1971, if, as to the latter, the federal division engineer determined that the project had been developed so as to minimize adverse environmental consequences.

Since, as already noted, the defendants herein contend that Devil's Slide project had received FHA design approval as early as October, 1968, they take the position that the project required neither an environmental impact statement under NEPA nor any federal division engineer determination under PPM 90–1; defendants also contend that in any event the previously mentioned "agency review", evidenced by the Environmental Fact Sheet of March 23, 1971, approved by the FHA division engineer on April 20, 1971, was a substantial compliance with FHA, PPM 90–1.

On September 5, 1972, subsequent to the commencement of this action, the state for the first time advertised for construction bids on the Devil's Slide By

Pass covering the most southerly 4.2 mile section of the project (with a view to calling bids for the remaining northerly 2.1 mile portion of the project in 1973 for completion contemporaneously with the 4.2 miles section).

On September 5, 1972, no plans, specifications or estimate approval had either been requested of, or granted by, FHA; by a letter of September 5, 1972, the state formally advised FHA of its advertisement for bids and confirmed that by such actions the state intended to forego its right to federal aid on the entire 6.3 mile Devil's Slide project; by letter of September 6, 1972, the Federal Highway Administrator acknowledged the state's position and withdrew all prior federal approvals of the project.

THE "FEDERAL PROJECT" ISSUE

■ A threshold question is whether the Devil's Slide By Pass project is "federal action" within the meaning of the federal statutes involved. If it is not, then, of course, absent some other federal issue, plaintiff's case against the federal defendants would fail for lack of jurisdiction over plaintiff's cause of action against the state defendants arising out of alleged violation of the State Environmental Statute—CEQA.

Both federal and state defendants move for summary judgment upon the ground that there is no "federal" project upon which this Court can act, pointing out that by advertising for bids on September 5, 1972, the state defendants have now put it beyond their power to apply for, and beyond the power of FHA to grant, federal aid funds to the Devil's Slide project.

Defendants cite 23 U.S.C. §§ 105 and 106; § 105 provides, in effect, that before a project may receive federal aid it must first receive FHA program approval; § 106 provides for submission of plans, specifications and estimates by the state and approval thereof by FHA before federal funds can be bound for a state project.

FHA Regulations, implementing the above statutes, provide that no federal funds may participate in state projects if applicable federal regulations are not followed (23 CFR–1.9); FHA Regulation 23 CFR 1.10(b) prohibits the state from advertising for bids on actual construction prior to the submission of plans, specifications and estimates to FHA and its approval thereof; FHA Regulation 23 CFR 1.12 provides that no work shall be undertaken on any federal aid project, nor shall any project be advertised for contract, prior to authorization by FHA.

Defendants contend that no such program approval, nor any approval of plans, specifications and estimates, had been obtained by the state from FHA prior to the state's advertisement for bids on September 5, 1972, and that, therefore, the state cannot now receive, nor can FHA grant, federal aid for the Devil's Slide project, citing cases to the general effect that, absent a federal-state contract for federal funding, federal law requirements are inapplicable to state projects. See Boston v. Volpe, 464 F.2d 254 (1st Cir. 1972); County Highway v. Smith, 454 S.W.2d 124 (Tenn. App.1969); Hoffman v. Stevens, 177 F. Supp. 898 (M.D.Pa.1959); Town of New Windsor v. Ronan, 329 F.Supp. 1286 (S.D.N.Y.1971).

Plaintiffs contend, however, that, even assuming the state's option to receive federal aid cannot at this point be restored, the Devil's Slide project is, nevertheless, a *federal* project, within the meaning of both the Federal Aid Highway Act and NEPA, regardless of whether federal funds are ultimately used on or obtainable for use on it. Plaintiffs' position is that the project is an integral part of the larger federal-aid primary aid Highway # 1 route, for which, as already noted above, federal aid has been used for construction to the north of the project and for which federal aid will be, or can be used on an already planned thirteen mile continuation of the highway from the project to the City of Half Moon Bay. Plaintiffs, relying on the authorities discussed below, contend to the general effect, that

under these circumstances neither the state nor the federal defendants should be permitted to segment the Devil's Slide By Pass as a separate project and to thereby eliminate it from federal participation at this late date for the obvious purpose of avoiding compliance with federal environmental laws.

In La Raza Unida v. Volpe, 337 F. Supp. 221 (N.D.Cal., 1971) this court, considering the application of federal environmental and similar statutes to state highway projects, held that there was no merit to defendants' contention that federal statutes do not become applicable until the state actively seeks federal funds for a project; that for purposes of applying the various federal environmental statutes and regulations, a highway project becomes a federal aid highway when the state has obtained *location* approval and, that any project for which federal aid thereafter remains an open option falls within the federal statutes and regulations.

The rationale of *La Raza Unida* is that Congressional policy statements in federal environmental and similar statutes, together with the legislative history of these enactments, indicate a great concern of Congress with problems of environmental protection, particularly in the area of highway construction; that common sense suggests that all the protections which the Congress has sought to provide would be futile gestures were the states and federal agencies allowed to ignore federal statutes and regulations until deleterious effects upon the environment have actually occurred while the option for receiving federal funds still remains open.

In the present case, as appears from the record herein, both state and federal highway officials had regularly complied with the various federal requirements ever since August, 1960, and up to September 5, 1972, with a view that the state would exercise, and the federal agency would recognize the state's option to receive federal funding for the Devil's Slide project.

Actual authorization of federal funds for a highway project is merely a final formalization of the federal government's commitment on a section of a federal-aid route in the course of various federal agency approvals. The importance of making federal environmental statutes applicable at these earlier approval stages is emphasized in *La Raza Unida*. Waiver of federal aid by the state, acquiesced in by the federal agency, at the last minute for a project, which has otherwise been long treated as a federal aid project, should not be made a ground for disclaiming the federal nature of the project where it appears that the purpose is to aviod compliance with federal statutory environmental requirements.

This is especially true in this case, where, at the time of filing suit and issuance of the temporary restraining order herein, the project was clearly a "federal project" in that the state defendants still retained their option to apply for federal funding.

The state's advertisement for bids on September 5, 1972, was undertaken, not only after commencement of this action, but while plaintiffs' application for a preliminary injunction was pending—an application which, if granted, would have halted such advertising. Further, the decision of the state to thus forego federal aid was made four days after this court had made a temporary restraining order, dated September 1, 1972, restraining defendants "from opening or considering any bids for the construction of subject project, awarding any contracts concerning construction or work orders with respect to such construction or taking any other action toward construction in connection with the project which would alter the present status quo until further order of this court".

Although that restraining order recited that the state defendants could proceed with "advertising" for bids, this provision was obviously intended to merely mean that the court did not wish to unnecessarily interfere with, or cause

unnecessary expense or delay on, advertising which would not become effective unless the court should deny plaintiffs' application for a complete halt on the project. Such intent of the court was made clear to defendants at an informal hearing on issuance of the temporary restraining order.

Other decisions by federal courts have considered the subject of segmentation of highway projects as it may affect compliance with environmental requirements.

In Indian Lookout v. Volpe, 345 F. Supp. 1167 (S.D.Iowa, 1972), the court held that, although various considerations may make it advisable to segment a project for financing or construction purposes, those considerations do not necessarily apply to the environmental impact of the project; that for the latter purpose an assessment might be required of all or a larger portion of the project; that the Congress intended NEPA to be broad enough to cover the area over which construction may be "coerced by construction of another segment in a different area"; that, where the environmental features of the project route have not been considered as a whole and where there is such a coercive effect, NEPA requires an environmental impact statement for the entire project. *See, also,* Named Individuals v. Texas Highway Department, 446 F.2d 1013 (5th Cir., 1971) to the same effect.[1]

In Thompson v. Fugate, 347 F.Supp. 120 (E.D.Virginia, 1972), the court, applying both the Federal Aid Highway Act of 1968 (23 U.S.C. § 128(a) as amended) and NEPA, held that meeting federal requirements for one twenty-one mile section of a highway project in order to partake of federal aid allotments for that segment, while, at the same time claiming that a remaining eight mile section is a separate project, would be an impermissible bureaucratic frustration of the purpose of these laws.

Lending support to the principles announced in these cases is FHA's own regulation, PPM 90–1, Sec. 6, requiring that the highway section included in an environmental impact statement should

---

1. In *Named Individual* the Fifth Circuit held that a highway project could not be considered in separate funding "segments" for purposes of the Secretary of Transportation's administrative review under 23 U.S.C. § 138 (Department of Transportation Act), 49 U.S.C. § 1653(f) (Supp.1971) (Federal Aid to Highway Act of 1968), and NEPA. In so ruling, the court remanded the action to the district court with directions to hold the case until the Secretary had completed his administrative review of the highway as one project under the relevant statutory provisions.

Subsequent developments in that action bear some relevance to the "federal project" issue here. Following remand of the action to the district court, the defendants moved for summary judgment for lack of subject matter jurisdiction on the grounds that the highway in question, in its entirety, was no longer a "federal project". They based this contention on an evidentiary showing that the state highway commission, which had initially sought federal funding for the construction of the highway, had severed its relationship with the federal government on the highway in question, thereby unequivocally terminating the state's request for federal aid. The district court, although indicating that the argument might have some merit, denied summary judgment because it thought that the Court of Appeals' decision in *Named Individuals,* supra, could be interpreted as permanently barring the state, once it had applied for federal funding for two of the three segments of the highway, from proceeding with construction of the highway until the federal defendants had complied with federal statutory requirements, and certified the question for an interlocutory appeal under 28 U.S.C. § 1292(b). See Order, filed October 28, 1971 (unpublished) in Named Individuals v. Texas Highway Comm., U.S.D.C., W.D.Tex. No. 67–72 (filed herein as Court's Exhibit). The Court of Appeals, without opinion, denied defendants' appeal of the district court's ruling; a concurring opinion, however, stated that "this attempted dis-engagement comes too late." See Order, filed December 28, 1971 (unpublished) in The Texas Highway Department v. Named Individuals, United States Court of Appeals, 5th Cir. Misc. No. 2243 (filed herein as Court's Exhibit).

be as long as practicable to permit consideration of environmental matters "on a broad scope" and stating that "piece-mealing proposed highway improvements in separate environmental statements should be avoided" and, further "that the section should be of substantial length that would normally be included in a multi-year highway improvement program."

As already noted, the record in our pending case indicates that the segment of highway, which defendants now claim is no longer a "federal project", is part of Highway # 1 which has been designated by the California Highway Commission, pursuant to 23 U.S.C. § 103(b), as a federal-aid primary route; that a substantial section of highway along the same route to the north of the project, as previously indicated, has already been built with federal funding under the Federal Aid Highway Act; that the proposed thirteen mile continuation segment, directly south of the project along the same route (i. e., from Half Moon Bay airport to the City of Half Moon Bay), is a continuation of Highway # 1 which the state plans to reconstruct as a freeway with federal funds and for which defendants are now undertaking the preparation of a NEPA statement upon the theory, however, that it will be a separate project. Plaintiffs predict, and the record indicates, a possible adverse aesthetic and recreational impact of the Devil's Slide By Pass project, not only within the project area itself, but also a possible adverse aesthetic and recreational impact on the rural Half Moon Bay area contiguous to the thirteen mile continuance, south of the project, resulting from freeway construction across a mountain barrier that has heretofore sheltered the southerly rural area from north-to-south commuter access and the rapid suburban sprawl that accompanies such access. In that sense the record indicates that, once action is taken on the Devil's Slide By Pass project, without compliance with existing environmental prerequisites, any separate, future consideration of environmental impact upon the planned freeway construction south of the project might well be an empty formality after the damage, if any, has already been done.

Upon the record above described and upon the principles laid down in the cases above noted, we conclude that the record does not show as a matter of law that the Devil's Slide By Pass project is not a "federal project" or for that reason beyond the subject matter jurisdiction of this court.

We also conclude upon the record herein, that it does not appear as a matter of law that plaintiffs lack standing, or that the action is barred by laches, or that the state defendants here are immune from suit under the Eleventh Amendment.

Accordingly, it is hereby ordered that the defendants' motion for summary judgment should be, and the same is hereby denied.

THE MERITS

■ Having concluded that the project here is a "federal action," the remaining issue is whether either federal defendants or state defendants have failed to comply with the environmental requirements of the federal and state statutes here involved.

It may be helpful to first summarize the case authorities considering the applicability of NEPA to projects which were ongoing at the time the statute became effective.

In Indian Lookout Alliance v. Volpe, 345 F.Supp. 1167 (S.D.Iowa, 1972), already noted above, the defendants, citing FHA Interim Guidelines, took the position that no NEPA environmental impact statement was required for a federal aid highway project that had received design approval prior to January 1, 1970, the effective date of NEPA. The court held, however, that, although there is much to be said for establishing a definite event after which NEPA compliance would not be required for projects already initiated, neither Congress nor the President's Council of Environ-

mental Quality (35 Fed.Reg. 7392 (1970)) had so provided.

On the contrary, the court, noting that CEQ had administratively interpreted NEPA as requiring that it should be applied "to the fullest extent possible" to federal actions even though they arise from projects or programs initiated prior to the enactment of NEPA held that such administrative guidelines should not be ignored except for the strongest reasons, citing numerous cases interpreting NEPA to the same effect.

In Arlington Coalition v. Volpe, 458 F.2d 1323 (4th Cir., 1972) the court held that, although Congress did not intend that all projects which were ongoing on the date of NEPA's enactment would be subject to its requirements, any such project would be subject if the project had not reached, prior to the effective date of NEPA, a construction stage at which the costs of altering or abandoning the project could so definitely outweigh whatever benefits might accrue therefrom that it might no longer be possible to change the project; that any doubt must be resolved in favor of NEPA applicability; that the Congressional requirement for environmental consideration to the fullest extent possible sets a high standard for federal agencies—a standard that must be rigorously enforced by reviewing courts. See, also, Thompson v. Fugate, supra.

In Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal., 1972), the court held that NEPA compliance is required for projects initiated prior to the effective date of NEPA; that, although the mere fact of the project not having reached construction stage would not necessarily subject the project to NEPA compliance (as implied in Arlington), the project would be subject to compliance if compliance was "practicable"; that in determining whether the filing of an environmental impact statement on projects ongoing at the time of NEPA was still practicable, the court should consider various factors, e. g., (1) the participation of the local community in the planning of the project; (2) the ex-

tent to which the state agency had attempted to take environmental factors into account; (3) the likely harm to the environment if the project is constructed as planned, and (4) the cost to the state of halting construction while it complies with NEPA.

We note also that, although there is no similar statutory language in 23 U. S.C. § 128, as amended, directing compliance to the fullest extent possible, FHA regulation PPM 20–8, implementing the 1968 amendment to § 128, provided as follows:

"The purpose of this PPM is to insure, *to the maximum extent practicable,* that highway locations and designs reflect and are consistent with Federal, State, and local goals or objectives. The rules, policies, and procedures established by this PPM are intended to afford full opportunity for effective public participation in the consideration of highway location and design proposals by highway departments *before* submission to the Federal Highway. Administration for approval."

Similarly, CEQA, although it does not by its own terms require compliance to the fullest extent possible, has been interpreted by at least one court as applying to ongoing highway projects which have not "reached the stage of completion where the costs of abandoning or altering the proposed route would clearly outweigh the benefits therefrom." Keith v. Volpe, 352 F.Supp. 1324 (C.D. Calif., 1972). We note also that the California Supreme Court, although not having yet passed on the applicability of CEQA to ongoing projects, did in its recent decision in Friends of Mammoth v. Bd. of Supervisors, Cal., 104 Cal.Rptr. 16, 24, 500 P.2d 1360 (1972) indicate that the legislative intent behind CEQA was that it be interpreted in such a manner as to afford the fullest possible protection to the environment.

In the pending case, as already noted, the Devil's Slide By Pass project had not reached the construction stage on

August 23, 1968, the effective date of the 1968 amendment to the Federal Aid Highway Act, 23 U.S.C. § 128; nor had it reached construction on January 29, 1969, the date when PPM 20–8, supra, was adopted by FHA; nor had it reached construction by January 1, 1970, the date of NEPA's enactment; nor had it reached construction by November, 1970, the date CEQA was enacted; nor had it reached construction by the effective dates of the various CEQ and FHA regulatory implementations of any of those statutes. Indeed, it has not, to this day, reached a stage of actual construction.

During this four year period the federal and state agencies have sought by means of narrowly drawn administrative regulations and interpretations to avoid compliance with these statutory requirements; no prior hearing concerning design or environmental impact has ever been afforded, notwithstanding the statement in regulation PPM 20–8 that this requirement is to be applied to the maximum extent practicable; nor has any environmental impact statement been filed notwithstanding the clear mandate of NEPA and CEQA that these requirements be met as far as possible on ongoing projects.

CONCLUSION RE MERITS—AND ORDER

For the limited purpose of determining whether plaintiffs have shown a likelihood of success on the merits warranting the issuance of a preliminary injunction, and without final determination on the merits, we hereby tentatively find that:

(1) Compliance by the federal defendants with the relevant provisions of NEPA and of the Federal Aid Highway Act, as amended, and by the state defendants with the relevant provisions of CEQA, has, since the enactment of these provisions, been, both under the principles laid down in *Indian Lookout* and *Arlington Coalition*, supra, and under the criteria set forth in Environmental Law Fund, supra, at all times practicable and should have been undertaken;

(2) Contrary to defendants' allegation, no "design approval" for the project, or the equivalent thereof, was given by FHA in October, 1968, or at any time prior to the cut-off dates fixed in the applicable regulations and guidelines relied upon by defendants as excusing compliance with NEPA and the Federal Aid Highway Act, as amended.

Accordingly, we find that plaintiffs have demonstrated a likelihood of success on the merits and it is therefore ordered that the defendants be preliminarily enjoined as follows:

(1) The federal defendants shall be enjoined from any further action on the Devil's Slide By Pass project pursuant to federal law, particularly from granting federal financial aid to the project, until the provisions of the Federal Aid Highway Act, 23 U.S.C. § 128, as amended, requiring certain public hearings, have been complied with, and until the provisions of NEPA, requiring the filing of an environmental impact statement, have been complied with covering the Devil's Slide By Pass project and any planned continuation of Highway # 1 southerly of the project, i. e., from Half Moon Bay airport to at least the city of Half Moon Bay—unless otherwise permitted by order of this court;

(2) the state defendants shall be similarly enjoined, under the pendent jurisdiction of this court, from any further action on the Devil's Slide By Pass project until and unless the provisions of CEQA, Cal.Pub.Res.Code § 21000 et. seq., requiring the filing of an environmental impact statement, have been complied with covering the Devil's Slide By Pass project and any planned continuation of Highway # 1 southerly of the project, i. e., from Half Moon Bay airport to at least the city of Half Moon Bay—unless otherwise permitted by order of this court.

No security bond shall be required unless and until otherwise ordered.