**Hiram B. ELY et al.**

v.

**Richard W. VELDE et al.**

**Civ. A. No. 459–70–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

July 9, 1973.

See also D.C., 356 F.Supp. 726.

Emanuel Emroch, Richmond, Va., for plaintiffs.

Vann H. Lefcoe, Asst. Atty. Gen. of Va., David G. Lowe, Asst. U. S. Atty., Richmond, Va., for defendants.

MEMORANDUM

MERHIGE, District Judge.

This case comes before the Court once again challenging the proposed construction by the Commonwealth of Virginia of a Reception and Medical Center for prisoners in the Green Springs area of

Louisa County, Virginia. The facts surrounding the litigation have previously been set out in detail, 321 F.Supp. 1088 (E.D.Va.1971), hence a brief summary of them will suffice here.

As a part of its long range plan to phase out use of the existing Virginia Penitentiary, the Virginia Department of Welfare and Institutions conceived plans for the construction of a diagnostic and medical center to be utilized by ill inmates and by those entering the penal system. The State acquired for the Center an option to purchase 200 acres of land in Green Springs, a rural community of considerable historical and architectural significance in Louisa County. Although the project was originally scheduled to be financed primarily with state funds, the Department of Welfare and Institutions applied for a total of $870,000 of federal funds pursuant to the Safe Streets Act, 42 U.S.C. § 3701 et seq., to be used in the construction of the Center.

Subsequent to the State's application for federal funds, the plaintiffs, who are Green Springs residents opposed to the construction of the facility in their community, brought this suit. The gist of their allegations was that the federal defendants, in approving the State's grant application, had failed to follow the requirements of the National Historic Preservation Act (NHPA) 16 U.S.C. § 470 et seq. and the National Environmental Policy Act (NEPA) 42 U.S.C. § 4321 et seq. Specifically, the plaintiffs charged that the Law Enforcement Assistance Administration (LEAA), the federal agency responsible for administering Safe Streets Act grants, had failed to take into account the effect of the Center on homes listed in the National Register of Historic Places [1] and had failed to issue an environmental impact statement as required by NEPA.[2] The defendants Federal and State officials, contended however, that because of the peculiar nature of the block grants administered by the LEAA, the statutory requirements of NHPA and NEPA did not apply. Although this theory prevailed in the District Court, the Court of Appeals for the Fourth Circuit held that the LEAA was not immune from the requirements of NHPA and NEPA and that an environmental impact statement was required before funds could be allocated to the Center. 451 F.2d 1130 (4th Cir. 1971).

1. 16 U.S.C. § 470f Effect of Federal undertakings upon property listed in the National Register; comment by Advisory Council on Historic Preservation.
The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i–470n of this title a reasonable opportunity to comment with regard to such undertaking.
At the time of the grant in question, June 30, 1970, Boswell's Tavern, which is several miles away from the tract, was in the National Register for Historic Places. Two additional homes, Hawkwood and Westend were placed on the Register in September, 1970.

2. 42 U.S.C. § 4332 Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts.
The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall— . . .
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action.

The record reveals that subsequent to the decision by the Court of Appeals, the defendants began preparation of a draft impact statement. The Virginia Department of Welfare and Institutions prepared the first draft of a statement, which was sent to the LEAA for finalization. On July 17, 1972, the LEAA circulated the draft statement to various federal agencies for their comments. By October, 1972, the Department of Welfare and Institutions had learned that there would be considerable delay before the LEAA could make a decision as to whether federal funds would be allocated for the system. Faced with such a delay, William L. Lukhard, Director of the Department, made the decision to withdraw the request for federal funds for the project.[3] He made clear, however, that the Department intended to use those funds previously earmarked for the Center for other purposes. Lukhard further made known that the Commonwealth intended to construct the Center totally with its own funds.

On the basis of the withdrawal of the request for federal funding for the Center, the defendants moved the Court on November 16, 1972, for summary judgment, their contention being that the action had become moot. By order dated December 21, 1972, the Court denied this motion. Its basis for so doing being that the plaintiffs might prevail in their prayer for injunctive relief if they could prove that by an impermissable bookkeeping shift, Virginia had enabled itself to enjoy the benefits of federal funding without meeting federal statutory requirements. The matter came on for trial with the plaintiffs contending that Virginia was indirectly using federal funds for the Center by substituting for its construction state funds originally destined for another project and then funding that other project with the federal funds previously allocated to the Center. In essence, the plaintiffs sought to prove through such an argument that the Medical and Reception Center is still being funded with federal funds, albeit under a different label. Second, the plaintiffs argued that even if no direct substitution effect could be proved, the initial approval by the LEAA of federal funds for the Center made it irrevocably federal in nature, to the end that the requirements of federal law could not be avoided by a subsequent repudiation of such funds for the Center, at least where the Commonwealth intended to make other use of the funds. It is to these contentions that the Court now turns, finding from the record before it the following facts.

The Safe Streets Act of 1968 provides for direct financial aid to the various states for the improvement of law enforcement and the administration of justice. The Act requires each state to establish a planning agency and a supervisory board to administer the funds which it receives.[4] Such an agency acts in a planning and coordinating capacity, both for the law enforcement activities of the state and its local subdivisions. All requests for Safe Streets Act funds are initially made to this agency, which in turn coordinates these requests and presents them to the United States. The agency created by Virginia is known as the Division of Justice and Crime Prevention (DJCP), and its supervisory board is the Virginia Council on Criminal Justice. LEAA administers the program on the national level.

Eighty-five per cent of the funds appropriated under the Safe Streets Act are made available to the states according to population as block grants.[5] There are a minimum of conditions attached to these grants, the concept behind the Act being that local officials know best what local needs are. See Ely v. Velde, 451 F.2d 1130, 1136 (4th Cir.

3. Letter dated October 19, 1972, from W. L. Lukhard to Richard N. Harris, Director, Virginia Division of Justice and Crime Prevention. (DJCP).

4. 42 U.S.C. § 3732

5. 42 U.S.C. § 3736

1971). Block grants are, however, divided into two categories, Part C grants, used for all aspects of the criminal justice system, and Part E grants, used only for corrections. The remaining fifteen per cent of the money appropriated by Congress comprises the discretionary funds, grants from which are made available to the states by the LEAA at its discretion.

In order to qualify for the funds slotted for its use, a state's planning agency must prepare and submit to the LEAA an annual comprehensive plan, describing how the state intends to improve law enforcement and the administration of criminal justice over the ensuing twelve months.[6] Such a plan contains a number of components, including a multi-year section describing the state's goals in the criminal justice area over a five-year period and an annual action program. The latter describes the nature of program expenditures for the given fiscal year by listing the proposed subgrants to localities and to state agencies. The plan must provide for a significant percentage of the proposed federal funds expenditures to be made by units of local government, rather than state agencies. The exact percentage governing such local shares is determined by formula, with approximately sixty per cent of the funds administered by the Virginia DJCP going to the localities. Although the planning agency is not required to provide in the annual statement a detailed account of the nature of the subgrants of federal money which it proposes to make, it must describe, among other things, "the direction, scope and general types of improvements to be made in the future."[7] The proposed Medical and Reception Center, for example, was described in the 1970 annual statement in general terms according to the purpose which it is to fulfill. No logistical details in terms of location, construction or eventual operations were included.[8]

Annual comprehensive statements are filed by each state with LEAA around January 1st of each year. The evidence before the Court is that LEAA spends two or three months reviewing the plans before approving them. During this period, there may be considerable dialogue between LEAA and the state agency concerning various aspects of a given plan, with changes being made in the plan to satisfy LEAA. Once the block grant is made, however, LEAA normally has no further involvement in the funding process. It extends a letter of credit to the planning agency of the state for the amount of the block grant, and the agency in turn makes available the active funds to the subgrantees upon their request. Further LEAA involvement may become necessary, however, in the event the state agency fails to follow all of the requirements of statute or regulation or, more importantly, fails to make subgrants in accordance with the comprehensive plan. In such a case, LEAA has the power to withhold payments against the letter of credit until such time as the state agency conforms.[9]

Once a block grant is given for a particular fiscal year, the funds may be drawn from it for two ensuing fiscal years. Thus, a grant for fiscal year 1970 would remain available until July 1, 1972. After that time, if not previously drawn, the funds would revert to the federal treasury. In Virginia, if DJCP learns that a particular subgrantee has not drawn the funds to which it is entitled, it will, with permission of LEAA, make adjustments in the state comprehensive plan and use the funds for other purposes. The funds are, therefore, seldom lost.

The official history of the Medical and Reception Center began in 1970, when the General Assembly of Virginia appropriated to the Department of Welfare and Institutions for the Center the sum of $2,925,000 from the State's general fund and $775,000 of special federal

6. 42 U.S.C. § 3733

7. 42 U.S.C. § 3733(4)(E)

8. PX 9

9. 42 U.S.C. § 3757

funds contemplated to be obtained under the Safe Streets Act. Pursuant to this appropriation, DJCP included in the fiscal year 1970 comprehensive plan filed with LEAA a program designated F-4, describing the proposed center. The plan allocated $275,000 for the Center for fiscal year 1970 and, forecasting future years' needs, stated that an additional $500,000 would be allocated for the Center. This plan was approved by LEAA, and, on Septemper 30, 1970, approval was given by the Virginia Council on Criminal Justice, the supervisory board over DJCP, to the Department of Welfare and Institutions to draw its money.

By the time the Department could begin drawing funds in the Fall of 1970, this litigation had begun. As a consequence, the funds were never drawn by the Department, and, on March 4, 1971, the $275,000 award was terminated by the Council on Criminal Justice. Immediately thereafter, DJCP requested LEAA approval for an adjustment in the 1970 comprehensive plan. This approval was forthcoming, and DJCP transferred the $275,000 to two other programs established in the 1970 fund. $269,632 of the sum was shifted to Program F-1, which had been designed for regional diagnostic and corrections units. This money was commingled with the $300,000 with which F-1 had been funded originally and then used for such local projects [10] as a Juvenile Detention Center for the City of Bristol and a jail for the City of Petersburg. The remaining $5,368 was transferred to Program F-2, dealing with community-based corrections, and disbursed to local units of government for Offender Aid and Restoration projects. In short, the

full $275,000 was expended for purposes other than the Center.

Prior to this litigation and the decision to terminate the subgrant under the 1970 comprehensive plan for the Center, the fiscal year 1971 annual plan had to be formulated and approved. Contained in this plan was a $250,000 allocation for the Center from Part C block funds. Also contained in a supplement to the 1971 plan was an allotment of $120,000 for the Center. This money was allocated from Part E funds, which were made available by Congress during fiscal year 1971 for corrections work. Both grants were authorized by the Council on Criminal Justice in the Fall of 1971 to be drawn by the Department of Welfare and Institutions for use in the construction of the center. No funds were ever actually drawn, however.

The fiscal year 1972 state plan again contained an allocation for the Medical and Reception Center, this time in the sum of $500,000 from Part E block funds. Although this allocation was approved by LEAA, the Department of Welfare and Institutions never formally filed for a subgrant of these funds from the Council on Criminal Justice. Instead, as noted previously, the Department made the decision in October, 1972, not to use federal funds for the construction of the Center. It stated firmly, however, its intention to put the full $870,000 to other uses.

. In order that Virginia not lose the $370,000 allocated to the Center for fiscal year 1971, it had to readjust its comprehensive plan and secure LEAA approval for the change, by June 30, 1973. In order not to lose the $500,000 allotment, DJCP must alter its 1972 plan before the end of fiscal year 1974. Ac-

10. A total of ten subgrants, primarily for construction purposes, were made under Program F-1. Only one of these, a grant of $82,056, for implementation of a regional training school for children, was made to the Department of Welfare and Institutions; the remainder going to local units of government. DX3. The record reveals that the $82,056 grant to the De-

partment had been made prior to the transfer of funds, although not all of the funds had been drawn by the Department by the time of that transfer. Had the transfer not been made, the additional projects under F-1 would not have been approved and the Department's funds would have come solely from the original $300,000 appropriation.

cordingly, the Department of Welfare and Institutions has submitted to DJCP six subgrant applications designed to make use of the $870,000 that had been allotted for the Center. The programs contained in these applications, listed by the amount of the proposed federal share, are as follows: [11]

1. $60,119: behavior-psychological study of parolled and work released offenders, data from which is to be used for classifications purposes.

2. $165,698: basic training and refresher training, including course work at Virginia Commonwealth University, for all correctional officers in the Division of Corrections.

3. $25,000: second phase of in-service training for Division of Corrections personnel. This grant will be used to finance a training coordinator's position.

4. $2,832: also requested as a part of the in-service training program, this grant is desired for one month's salary for a VCU consultant to help design the program.

5. $123,278: first phase of a behavior modification program aimed principally at maximum security inmates who have shown few tendencies toward rehabilitation.

6. $490,000: second phase of the behavior modification program. These funds include the proposed leasing of a prison facility from the City of Norfolk to be used for hardened inmates.

In regard to these programs, it was the uncontradicted testimony of William L. Lukhard, Director of the Department of Welfare and Institutions, that the personnel training program was the only one that had been contemplated by the Division of Corrections prior to the Oc-

tober decision to apply the $870,000 fund to purposes other than the Medical and Reception Center. The negotiations with the City of Norfolk to lease its jail facility did not begin, for example, until Mid-December, 1972. Lukhard further testified that the federal money for the in-service training program has been utilized to improve the program and that without the money the scope of the program would be reduced.

The Virginia budget was amended in 1973 to reflect the shift of federal funds from the Center to these other programs.[12] The Court cannot discover, however, any additional appropriation to Welfare and Institutions for the Medical and Reception Center. Rather, the General Assembly in 1973 simply reappropriated $2,022,000 out of the general fund that had not been spent from a previous year's appropriation. Presumably, additional funds for the Center will be appropriated in future years as needs arise.

On the record and all of the facts before it, the Court must conclude that the plaintiffs have not borne the burden upon them of proving that, through bookkeeping shifts, the Department of Welfare and Institutions intends to fund the Medical and Reception Center directly or indirectly with federal funds. As the Court stated in its December 21 memorandum, the plaintiffs well might prevail if they could show that the State of Virginia had shifted funds from one or more projects to the Center's use and then had refunded that project with the federal funds originally destined for the Center. If, as a simple example, funds appropriated for the salaries of corrections personnel had been shifted to the Center and then the

11. Memorandum to R. N. Harris, Director, DJCP from W. G. Sewell, Jr., Delinquency and Corrections Coordinator, DJCP, dated 6/4/73. DX4

12. Ch. 464, Acts of Assembly of 1973, Items 71, 378.2. The General Assembly allocated $1,075,000 in LEAA funds to the Department of Welfare and Institu-

tions. The $205,000 difference between this figure and the $870,000 fund represents money that was to have been allocated to the Center in the 1973 and/or 1974 comprehensive plans. Letter from W. L. Lukhard to John R. McCutcheon, Director, Virginia Division of the Budget, dated 2/2/73. DX28.

$870,000 in question here had been directed to fill the void left by that shift, the Court would have no difficulty in concluding that an impermissible bookkeeping maneuver had been utilized to fund the center indirectly with federal money where it could not have been funded directly. The Center would, in short, remain a federally assisted project and be subject to the strictures of federal law.

The facts in this case do not however support such a conclusion. As to the original $275,000 allocated to the Center in fiscal year 1970, the record reveals that the vast majority of it, commingled with other funds, went to local governmental bodies for corrections purposes, not to state agencies. It is true that the Department of Welfare and Institutions did eventually use a small part of this sum, in the sense that $300,000, the original block allocation for Program F-1, had been fully drawn before the Department completed its draw down. Its project, however, had been approved for use prior to the transfer of the $275,000, so that it would have been fully funded had the transfer never been made. The transfer thus made possible the projects authorized after the transfer, not prior to it. The fact that the Department may have used the funds in the above described sense does not create an improper substitution effect.

The Court reaches a similar result with respect to the $870,000 sum allotted to the Center in 1971 and 1972, but never spent. Of this sum, the amount of $673,497, representing proposed expenditures for the behavior modification program and for gathering psychological data, is slated to be used for programs that were not in existence prior to the decision to forego federal funds for the Center. Federal money will pay at least 75% of the cost of each project. These federal funds, the Court concludes, were a major, if not decisive, impetus behind the proposed implementation of the projects; without the funds, the projects probably would not have been proposed and no state funds would have been scheduled for them. The Court cannot conclude, therefore, that there existed money that would normally have gone to these projects which will be released for use on the Center.

As to the personnel training project, the Court reaches the same result. While this project had been conceived prior to the time the Department of Welfare and Institutions could have known that Center funds would be available for it, the evidence reveals that the federal money will be used to improve the program rather than to save the State money. No state funds will thus be released by virtue of the decision to use partial federal funding for this project.

Finally, there is no evidence to show that even if any of the projects had resulted in the release of state funds, the Department of Welfare and Institutions or the General Assembly has applied any such savings to the Center. Indeed, the evidence before the Court is that the amount to be expended on the Center has simply been reduced by the amount of the lost federal funds and that no additional state funds from any source will take their place. On such facts, the Court cannot conclude that the Center is being indirectly funded with federal money.

The plaintiffs argue, nevertheless, that in order to satisfy the environmental policies of NEPA and NHPA, the Court should rule that the Medical and Reception Center became irrevocably federal at the time the annual comprehensive plans were approved by LEAA. Their position, in short, is that the Center has become a federal project and that the Center can no longer be built without meeting all of the requirements of federal law, regardless of its actual, final financing. On this premise they contend that they are entitled to an injunction against the construction of the Center. This differs from the plaintiff's substitution argument, where they would, if successful, have been entitled to no more than an injunction against

the transfer by LEAA of the $870,000 sum to Virginia.

██ In order for a project to be "federally assisted" within the meaning of NHPA or a "major Federal action" within the meaning of NEPA, it must be wholly or partially funded with federal money. It is this money which imparts a federal character to a project and gives rise to the necessity of meeting the statutory requirements of those two acts. Without such federal funds, the project remains local in nature.

In practice, the actual transfer of funds from federal to state or local hands may not, in the case of any given project, take place at the same time the project is originally approved by federal authorities. It may not, in fact, occur until after all planning for the project is completed and actual construction begun. Yet, statutory environmental requirements such as an impact statement must be performed long before this late date in order for their purposes to be properly effectuated. For this reason, courts have not hesitated to declare a project to be at least tentatively federal long before any actual transfer of funds. In La Raza Unida v. Volpe, 337 F.Supp. 221 (N.D.Cal.1971), for example, a district court held that a highway project became federal for NEPA purposes at the time the Federal Highway Administration gave location approval pursuant to the Federal-Aid Highways Act, 23 U. S.C. § 101 et seq., even though state authorities had not made a final decision even to apply for federal funds.

██ Contrary to the plaintiff's position, this Court cannot conclude that a project which has become tentatively federal necessarily must remain that way. Such a conclusion flys in the face of the fact that it is federal funding which makes a project federal in nature. There is considerable logic, in fact, to the position that a state should normally be able to repudiate federal funds and not be bound by federal law up until the time that it actually accepts, or perhaps even spends the United States' money.

In accordance with this position, the Court must reject the plaintiffs' argument here that, notwithstanding the fact that LEAA approval came long before any actual transfer of federal funds and that projects originally approved by the LEAA are often modified or even cancelled, this approval by itself locks the defendants into the position of having to comply with federal law.

Nevertheless, some courts have held, with persuasive reasoning, that there may be situations where a project becomes irrevocably federal at a time prior to the actual transfer of funds. The theory behind these cases seems to be that there may be so many federal contacts with a project after its tentative federal imprimatur that the project becomes so imbued with a federal character as to preclude it from being viewed as anything but federal. The actual acceptance of funding would become only a technicality under this theory, and, even if the state elects to forego federal money, it cannot relieve itself from the requirements of federal law. See Named Ind. Members of San Antonio Conserv. Soc'y v. Texas Highway Department, 446 F.2d 1013 (5th Cir. 1971), where the Secretary of Transportation had authorized federal participation in an expressway project, there had been close contacts between federal and state agencies in planning the highway, and construction had, in fact, already begun.

Notwithstanding the fact that federal funds had not changed hands between state and federal defendants, the Court held that the project had become federal and that the state defendants would be bound by the requirements of federal law. Similarly, a district court in Sierra Club v. Volpe, 351 F.Supp. 1002, 1007 (N.D.Cal.1972), held that "[w]aiver of federal aid by the state, acquiesced in by the federal agency, at the last minute for a project, which has otherwise been long treated as a federal aid project, should not be made a ground for disclaiming the federal nature of the project where it appears that the purpose is to avoid compliance with federal statuto-

ry environmental requirements." *Sierra Club* also involved a federal-aid highway in which design and planning had proceeded essentially as a joint federal-state project.

The courts in both *San Antonio Conservation Soc'y* and *Sierra Club* rested their holdings upon the tremendous number of federal contacts with the highways in question. They were additionally influenced by two other factors. First, in both cases the states would have been able, had they repudiated federal funding for the particular highway in question, to take advantage of quasi-block funding under the Federal-Aid Highways Act to use the same funds for other roads. They would, therefore, like Virginia in this case, be able to substitute a different project and remain enriched by the amount scheduled for the original project. Second, federal aid in both cases was being waived after the commencement of litigation and solely because federal environmental requirements would be too difficult to meet.

The legal theory urged by plaintiffs and adopted by *San Antonio Conservation Soc'y* and *Sierra Club* is both inviting and innovative. Given the fundamental premise that it is the federal funding of a project which triggers the requirement that federal statutory provisions be met, it is true that it is no small step to conclude that those provisions must be met even where the state thereafter desires to forego such funding. There is, however, much virtue in the position here espoused that a given project having been viewed as federal in nature for a period of time, with seemingly federal contacts, such appearance becomes reality and the project must be considered irrevocably federal. Unfortunately for the instant plaintiffs, enticing as the theory is, every case rests upon the facts adduced and in this instance, the facts presented do not point to such federal involvement in the Center as to conclude that for all appearances and purposes it has become permanently federal. In this reference, several

observations are relevant. First, while it may be and indeed is relevant that a state has repudiated federal funds for the sole reason that the environmental requirements for a particular project may be too burdensome to meet, such fact is by no means conclusive of the issue. It is clear, for example, that the Virginia Department of Welfare and Institutions, *prior* to the submission of its comprehensive plan to LEAA, could have chosen not to apply for federal money for the center solely because it felt that the environmental requirements of federal law would be too difficult to conform to. See James River & Kanawha Canal Parks, Inc. v. Richmond Metropolitan Auth., 359 F.Supp. 611 (E.D.Va., 1973). A project must be federal before an impact statement, for example, must be filed, and it is circular reasoning to say that a project has become federal by virtue of the fact that the defendants do not desire to file such a statement. Further, the fact that a state may shift funds away from one project for use on another does not mean that environmental requirements will not have to be met. The alternative project becomes federal in nature when funds are diverted to it and federal statutory requirements would have to be followed in regard to it.

Upon a thorough review of the complete record in this case, there is virtually no evidence of federal contacts, significant or otherwise, with the Medical and Reception Center. LEAA originally approved federal funding for the Center on the basis of the 1970 comprehensive state plan, which contained only a one page reference to the Center.[13] This reference included a one paragraph statement of purpose and a two paragraph general description of the proposed center. It failed to even specify any proposed location for the Center. Daniel Skolar, Director of the Office of Law Enforcement Programs of LEAA, testified in the original trial of this matter[14] that LEAA very seldom knew the locations for proposed state projects

13. PX 9.

14. November 3, 1970, Trans. at 338–53.

and was interested only in the "direction, scope, and general nature of the effort to be carried forward." [15] No evidence was adduced to show that LEAA had ever objected to the Center, demanded changes in the sections of the various comprehensive plans submitted to it which dealt with the Center, or even requested additional information concerning it.

The whole nature of LEAA block grants leads to the conclusion that there was never a federal aura surrounding the Center. As described previously, LEAA funds are designed to be administered with a minimum of conditions attached and with very little federal control. Programs originally proposed can be altered, amended and substituted. The various programs specified are independent from one another, such that an entire comprehensive plan, for example, should not be considered as a single project within the meaning of applicable federal law. The only real contacts that federal authorities have had with the Center stem from this litigation and from the original attempt by the Virginia defendants to file an environmental impact statement. The Court does not consider these contacts substantial. In contrast to the federal-aid highways plans involved in *San Antonio Conservation Soc'y* and in Sierra Club, therefore, there has been virtually no federal involvement in the planning of the Medical and Reception Center. The Court reaches this conclusion notwithstanding the comment of Judge Sobeloff, at 451 F.2d at 1137–1138, n. 22, concerning "the LEAA's overall involvement in the promotion and planning of the Center." Such comment was made in a different context from that in which the Court presently considers LEAA involvement with the Center.

Nevertheless the Court has made every effort to meticulously review all the evidence adduced and fails to find any evidence warranting a conclusion that LEAA was involved in the promotion and planning of the Center to any extent whatsoever. The instant plans are, to say the least, Virginia born and Virginia bred and are, depending on one's point of view, neither blessed nor damned with Federal involvement.

Having so concluded, it follows that the Virginia Department of Welfare and Institutions had the power to withdraw its request for federal funds for the Medical and Reception Center and to build the Center without complying with the provisions of NEPA and NHPA. Its exercise of this power has now rendered the case against the Department moot and terminated the need for an injunction.

An order in accordance with this memorandum will issue.