**JAMES RIVER and Kanawha Canal Parks, Inc.**

v.

**RICHMOND METROPOLITAN AUTHORITY et al.**

Civ. A. No. 12–73–R.

United States District Court,
E. D. Virginia,
Richmond Division.

May 7, 1973.

Cohen & Rosenblum, Ltd., Bernard S. Cohen, Geoffrey Judd Vitt, Alexandria, Va., for plaintiffs.

R. Harvey Chappell, Jr., James R. Sault, Asst. City Atty., Stuart H. Dunn, Asst. Atty. Gen., Rodney Sager, Asst. U. S. Atty., George William Warren, IV, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This is an action challenging the proposed construction of a limited access expressway into the downtown area of the City of Richmond, Virginia. The plaintiffs are the James River and Kanawha Canal Parks, Inc. (hereinafter referred to as "Canal Corporation"), a non-profit Virginia corporation, the objectives of which are the preservation and restoration of the James River and Kanawha Canal, and Douglas C. Deaton, a contributing member of the corporation who has used the James River and Kanawha Canal for recreational purposes.[1] There are four groups of defendants:

1. The Richmond Metropolitan Authority (hereinafter, RMA), a corporate, political subdivision of the Commonwealth of Virginia, empowered to plan, construct and maintain public highways within the Richmond metropolitan area, and its general manager, George W. Cheadle;

2. Thomas J. Bliley, Jr., and William J. Leidinger, Mayor and City Manager, respectively, of the City of Richmond (hereinafter, "Richmond defendants");

3. Douglas B. Fugate, Commissioner of the Virginia Highway Commission (hereinafter, "Virginia defendant");

4. Claude S. Brinegar, Acting Secretary of the United States Department of Transportation, and Harold C. King, Division Engineer for Richmond of the Federal Highway Administration (hereinafter, "United States defendants").

In addition to these four sets of defendants, the Carillon Civic Association, representing the homeowners of an area through which the Expressway is scheduled to pass, has been allowed to intervene as a party defendant.

---

1. Deaton was added to the action subsequent to the filing of the complaint pursuant to an agreement by counsel.

The action is one for a declaratory judgment and injunctive relief. The legal claims on which it is based are summarized as follows:

1. Due to alleged federal involvement in the planning and construction of the Downtown Expressway, the defendants must adhere to certain federal statutory requirements in the construction of the road. The following provisions are cited by the plaintiffs: Sections 101(b) and 102(2) of the National Environmental Policy Act, 42 U.S.C. §§ 4331(b) and 4332(2);[2] sections 128, 134 and 138, Federal-Aid Highways Act, 23 U.S.C. §§ 128, 134 and 138,[3] and Policy and Proce-

2. Section 101(b), 42 U.S.C. § 4331(b):
"In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—
(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice; . . . "
Section 102(2), 42 U.S.C. § 4332(2):
"The Congress authorizes and directs that, to the fullest extent possible: . . .
(2) all agencies of the Federal Government shall—
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any evironmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes; . . . "

3. Section 128, 23 U.S.C. § 128:
"(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary [of Transportation] that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway. Such certification shall be accompanied by a report which indicates the consideration given to the economic, social, environmental, and other effects of the plan or highway location or design and various alternatives which were raised during the hearing or which were otherwise considered.
"(b) When hearings have been held under subsection (a), the State highway department shall submit a copy of the transcript of said hearings to the Secretary, together with the certification and report."
The plaintiffs seek to amend their complaint to state a claim under section 134. The Virginia defendant has opposed this amendment, and the Court considers it subsequently. Section 134, 23 U.S.C. § 134, provides the following:
"(a) It is declared to be in the national interest to encourage and promote the development of transportation systems, embracing various modes of transport in a manner that will serve the States and local communities efficiently and effectively. To accomplish this objective the

dure Memorandum 20–8, 23 C.F.R. App. A, promulgated to implement section 128; Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f); [4] Section 106 of the National Historic Preservation Act of 1966, 16 U.S.C. § 470f,[5] and a regulation promoted thereunder, 36 Fed.Reg. 3312 (February 20, 1971).

2. Because the proposed expressway allegedly requires an encroachment upon navigable waters of the United States, the defendants must apply, pursuant to the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401 and 403,[6] to the Corps of Engineers and the Secretary of the Army for a construction permit.

Secretary shall cooperate with the States, as authorized in this title, in the development of long-range highway plans and programs which are probably coordinated with plans for improvements in other affected forms of transportation and which are formulated with due consideration to their probable effect on the future development of urban areas of more than fifty thousand population. After July 1, 1965, the Secretary shall not approve under section 105 of this title any program for projects in any urban area of more than fifty thousand population unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section. No highway project may be constructed in any urban area of fifty thousand population or more unless the responsible public officials of such urban area in which the project is located have been consulted and their views considered with respect to the corridor, the location and the design of the project."
Section 138, 23 U.S.C. § 138:
"It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from a historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such' land, and (2) such program includes

all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use."

4. The language of this provision is almost identical to that of 23 U.S.C. § 138, see n. 3, *supra*.

5. 16 U.S.C. § 470f:
"The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470(i)–470(n) of this title a reasonable opportunity to comment with regard to such undertaking."

6. 33 U.S.C. § 401:
"It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: *Provided,* That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construction is commenced . . . ."
33 U.S.C. § 403:
"The creation of any obstruction not affirmatively authorized by Congress, to the

3. The Ninth Amendment to the United States Constitution establishes the right to a non-degraded environment and to the preservation of parklands and historic structures, which right would be violated by the defendants' construction of the Downtown Expressway.

4. By their acts, the defendants have deprived the plaintiffs of life, liberty and property without due process of law in contravention of the Fifth and Fourteenth Amendments. These claims are levelled against RMA, Richmond and the Virginia defendants pursuant to 42 U.S.C. § 1983.

5. The construction of the Downtown Expressway would be violative of Article XI, § 1 of the Virginia Constitution.[7]

The complaint was filed on January 9, 1973, one day before RMA intended to offer for sale revenue bonds to finance the Expressway. The uncertainty of the litigation required RMA to postpone the sale. Because of the unstable condition of the bond market and because RMA had secured a very favorable interest rate on the sale, the defendants sought to expedite this matter in any way possible, in order that the sale of the bonds might be rescheduled as soon as possible. The plaintiffs agreed to such an expeditious proceeding and further agreed with the defendants that an evidentiary hearing might well be avoided. Accord-

ingly, both sides have submitted motions for summary judgment, accompanied by a considerable number of exhibits, depositions and lengthy memoranda. It is these motions with which the Court is primarily concerned. Two other groups of motions, both contested, are also ready for determination, however. One is a motion by the plaintiffs to amend their complaint. The second is a group of motions by the several defendants to require the plaintiffs to furnish security to cover the costs and damages that may be incurred by the defendants because of litigation. Since the aggregate requests exceed Thirty Million Dollars, the Court assumes that the various defendants seek protection from a drastic increase in interest rates on the bonds which might occur during the delay caused by this litigation. Before turning to the specific legal claims and defenses made by the parties in their various motions, the Court deems it appropriate to examine the background of the Downtown Expressway and of the James River and Kanawha Canal.

## BACKGROUND

*Downtown Expressway* [8]

The genesis of the Downtown Expressway was a report presented to the Richmond City Council on June 30, 1965, by the Committee on Trafficways, creat-

---

navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and

authorized by the Secretary of the Army prior to beginning the same.

7. "To the end that the people have clean air, pure water, and the use and enjoyment for recreation of adequate public lands, waters, and other natural resources, it shall be the policy of the Commonwealth to conserve, develop, and utilize its natural resources, its public lands, and its historic sites and buildings. Further, it shall be the Commonwealth's policy to protect its atmosphere, lands, and waters from pollution, impairment, or destruction, for the benefit, enjoyment, and general welfare of the people of the Commonwealth."

8. Much of the material which follows comes from the affidavit of George W. Cheadle, General Manager of the Richmond Metropolitan Authority, filed February 20, 1973.

ed by the Council. The essence of the report was that there was a major demand for traffic arteries along a north-south corridor from Bryan Park on the north side of Richmond to the Chippenham Parkway on the south side of the James River and along an east-west corridor from the Richmond-Petersburg Turnpike in downtown Richmond to Parham Road on the west side of Richmond. Because of the projected heavy use of these corridors, the committee recommended that they be serviced by limited access expressways. Inquiries having been made, to no avail, into the possibilities of federal or state funding of such an expressway system, the Committee recommended the creation of an independent authority to construct the system on a toll road basis. These recommendations were subsequently ratified by the five volume Richmond Regional Area Transportation Study (RRATS), formally published in 1968.[9]

The Richmond Metropolitan Authority came into existence by act of the Virginia legislature on July 1, 1966.[10] Empowered to acquire real estate by eminent domain or otherwise, to enter into contracts, and to issue bonds, RMA was directed to promote highway safety and to expand the construction and maintenance of bridges, tunnels and roads within the Richmond metropolitan area. Its primary function, however, was the final planning and the construction of an expressway system within that metropolitan area. By 1966, the final plans had taken shape for the construction of four expressways:[11] (See Appendix A)

1. The Beltline Expressway, running south from the juncture of Interstates 95 and 64 north of Richmond to the Douglasdale Road area;

2. The Powhite Parkway, running northeast from the Chippenham Parkway on the south side of the James River, across the James River Bridge to connect with the Beltline Expressway in the Douglasdale Road area;

3. The Riverside Parkway, running along the southern banks of the James River from Huguenot Road east to the James River Bridge and the Powhite Parkway;

4. The Downtown Expressway, running east from the juncture of the Powhite and Beltline Expressways at Douglasdale Road through downtown Richmond, connecting with the Richmond-Petersburg Turnpike in the east central section of Richmond. A feeder road was also planned to run from the Cary Street Road area of the Beltline Expressway southeast to the Downtown Expressway just west of the Boulevard.

In September, 1966, RMA entered into an agreement with Richmond by which the City guaranteed $20,000,000 in temporary bond anticipation notes to the Authority. On October 23, 1966, RMA announced its proposed plans to the public by the publication of a newspaper supplement.[12] Pursuant to its agreement with the City, RMA held a public hearing [13] to receive comments on the proposed routes on November 8, 1966. It also opened an office in downtown Richmond where the proposed routes were displayed and where comments could be received and questions answered. According to the defendant Cheadle, General Manager of the RMA, the public response "was substantial and overwhelmingly in favor of the construction along the proposed routes." [14]

In early 1967, having received the $20,000,000 loan, RMA began to finalize

9. Deft. RMA, Ex. 3.

10. Va.Code Ann. § 33.1–320 (1970), Acts of Assembly, 1966, Ch. 178; Deft. RMA, Ex. 5.

11. Deft. RMA, Ex. 7 and Ex. 13 at Appendix C, p. C–4.

12. Deft. RMA, Ex. 7.

13. Transcript, Deft. RMA, Ex. 6.

14. Affidavit of George M. Cheadle, p. 6. That RMA was amenable to public suggestions is shown by its decision, in response to public criticism, to modify the route of the Downtown Expressway between Linden Street and Davis Avenue in the near western part of the city.

construction plans and to acquire property along the rights-of-way. Nearly all of the $20,000,000 was expended in this process, with the result that RMA has already cleared nearly ninety per cent of the proposed right-of-way. By the spring of 1968, however, after having solicited and received construction bids on several segments of the system, the Authority concluded that inflation and rising interest rates would cause actual construction costs to rise considerably above the original estimates. All bids were rejected, and RMA entered into discussions with several large contractors explaining the possibility of one contractor constructing the entire system and thereby lowering costs through economy of scale. These negotiations never resulted in a sufficient cost reduction, however, and they were abandoned.[15]

Prior to the final decision not to construct the full system with private funds in mid-1967, the first contacts were made by RMA, through the Virginia Highway Commission, with the Federal Highway Administration (FHA),[16] concerning the possibility of federal financing for part of the expressway system. The details of these contacts are critical to the issue of federal involvement in the Downtown Expressway and thus whether federal statutory requirements must be met, and a discussion of them will be deferred until the Court considers that issue. Suffice it to say, however, that the FHA eventually agreed to build part of the Beltline Expressway as an interstate spur. At the time of this litigation, the spur has been designated I–195 and is under construction. It extends from the juncture of interstate routes 64 and 95 at Bryan Park on the north side of Richmond, to the Cary Street Road area, with a feeder extending to McCloy Street, west of the Boulevard.[17]

Once the FHA agreed to finance the Beltline Expressway, RMA was relieved of a considerable financial burden. It then instructed its consulting engineers to analyze the remaining elements of the project, approximately 9.7 miles, to determine how much could be undertaken with revenue bond financing. The engineers recommended to RMA that it proceed forthwith with the James River Bridge, with the Powhite Parkway, and with that part of the Beltline Expressway running south from the end of I–195 in the Cary Street Road area to the intersection with the Powhite Parkway in the Douglasdale Road area. This total distance of 3.3 miles was financed with a bond issue of $51,300,000 [18] and has been completed.

RMA continued to seek ways to finance the construction of the Downtown Expressway. In July, 1972, the means became available when the Virginia Highway Department, together with the City of Richmond, agreed to construct a segment of the road running from the feeder from I–195 to McCloy Street east to Meadow Street (McCloy to Meadow Connection). With this agreement finalized, RMA had only to finance the segment of road from the juncture of the Powhite and Beltline Expressways in the Douglasdale Road area to its intersection with the McCloy to Meadow Connection just west of the Boulevard and the remainder of the Downtown Expressway east. The Authority was then able to arrange for a $124,295,000 bond issue, including the refunding of its original seven per cent bonds. The sale of this issue was scheduled for January 10, 1973, at an interest rate of 5.50 per-

15. Deposition of George W. Cheadle, February 23, 1973, at 23–24.

16. At the time of first contacts, this was known as the Bureau of Public Roads. The Court will refer to it throughout this memorandum by its current name.

17. Affidavit of Harold C. King, filed February 20, 1973, attachment A.

18. Refinancing of the initial bonds has been required, increasing the total outstanding bonds on this segment to approximately $53,000,000.

cent, but, as noted previously, was cancelled by virtue of this litigation.

### James River and Kanawha Canal [19]

Shifting from highways to history, the Court turns briefly to the James River and Kanawha Canal. The story of the canal begins as early as 1785, when the James River Company, with George Washington as its president, was incorporated for the purpose of building a navigational road west. In 1795 a short canal, beginning at the present location of the Byrd Park pumphouse, was opened. This canal was extended eastward for a short distance to connect with the Richmond Basin, a large terminus for the canal constructed around the turn of the nineteenth century and located between what are now Eighth and Twelfth Streets, south of Main Street. While the canal company extended its system westward during the first half of the nineteenth century, the Richmond Dock Company was established and began construction of deep water dock facilities on the tidewater side of the James River fall line at Richmond. In 1841, the James River and Kanawha Canal Company purchased the dock company and began work on a system of locks to connect the lower James with the canal. By 1854 the Tidewater connection was complete and consisted of five great stone locks which formed a flight of water stairs from the terminus basin to the dock area on the James. Within the next twenty years, however, the canal suffered from the ravages of the Civil War and, significantly, from railroad competition. By 1880, it was no longer a profitable operation and was sold to the Alleghany Railroad Company. With the laying of tracks along its towpath, the James River and Kanawha Canal became no more than an instrument of historical interest.

The Tidewater Connection itself, which is the primary focus of this suit, no longer exists in its original state. Upon the purchase of the canal by the railroad around 1880, most of the locks were filled with dirt and were used as a right-of-way for a railroad spur line.[20] The Great Boat Basin, which ran roughly from what is now Eighth Street to Twelfth Street, was filled and used as a turning yard for the railroad. Most of it is now covered by a parking lot. Indeed, about the only part of the old Tidewater Connection which is not now covered by some sort of structure is the lower two locks, located on the property of Reynolds Metals Company. The record reveals that Reynolds has taken steps to preserve and restore these locks.[21]

From the best historical evidence available concerning the underground location of the remaining three locks, it appears that the Downtown Expressway will require their destruction or relocation,[22] as well as that of the Great Basin. The complaint describes the damage thusly:

> The Downtown Expressway, depressed below the surrounding ground level, will bisect the Canal in the vicinity of 6th and 7th Streets between Canal and Byrd Streets. An exit ramp to the east will require both a cut and a fill, thus rupturing the walls of the Canal. The Downtown Expressway will also cut through the walls of the Canal in this same area. A west entrance ramp at 7th Street will similarly cut through the walls of the Canal. Foundations for the overpass servicing the Manchester Bridge, which

19. The material which follows is derived from documents used to nominate the canal for the National Register of Historical Places, plaintiff's Ex. B & C.

20. Deposition of Eugene B. Sydnor, Jr., February 15, 1973, p. 32.

21. The president of the Canal Corporation, Eugene B. Sydnor, Jr., testified that it was his understanding that many of the Reynolds' facilities abutting the locks are temporary and are to be removed within the next eight to ten years. *Id.* at 40.

22. *Id.* at 37; Plaintiff's Ex. C (Nomination form for National Register of Historic Places).

presently crosses the James River and feeds into Canal Street between 8th and 9th Streets, will rupture the former Great Basin and cause permanent structures to be implaced in the South Basin between Byrd and Canal Streets. The Downtown Expressway will cut through the Canal and the Great Basin and destroy existing facilities from 8th Street to 12th Street. From the vicinity of 12th Street east, the footings required for the portions of the Downtown Expressway raised above surrounding ground level are not defined, but in the vicinity of 16th and Dock Streets, major concrete structures will be necessary to effectuate a connection with the Richmond-Petersburg Turnpike (I–95), and substantial pilings will probably have to be routed into the Canal's stonework.

Since the description of the damage is not presently contested by the defendants, the Court assumes for purposes of these motions that it is accurate. It should be noted, however, that RMA has tentatively agreed to expend approximately $500,000 in additional construction costs to help relocate existing locks to form a connection between the James River and Kanawha Canal and the even older Haxall Canal in the vicinity of Fifth Street.[23]

With this background of the highway and of the canal in mind, the Court turns to the legal claims and defenses raised by this action.

## JURISDICTION

Plaintiffs assert that jurisdiction is conferred on this Court by the Administrative Procedure Act, 5 U.S.C. §§ 701–706 and by 28 U.S.C. §§ 1331(a), 1343, 1361, 2201 and 2202. Both the Richmond and federal defendants, however, contest several of these bases of jurisdiction.

■ Jurisdiction over the United States defendants for the federal statutory claims other than that under the Rivers and Harbors Act is conferred by the Administrative Procedure Act, 5 U. S.C. § 702. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This jurisdiction extends to the nonfederal defendants as well, since it is alleged that they have taken advantage of the benefits conferred by federal law and because their activities could otherwise make a "sham" of federal statutory requirements if these requirements must be met in this case. Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1329 (4th Cir. 1972). Jurisdiction over the federal constitutional claims, which may properly be asserted by the plaintiff Deaton, is attained by virtue of 28 U.S.C. § 1343, since it is alleged that the acts of the nonfederal defendants were carried out under color of state law.

■ The jurisdictional basis for the plaintiff's Rivers and Harbors Act claim is the federal question provision, 28 U. S.C. § 1331. While there is no question that this claim arises under the laws of the United States, the Richmond and federal defendants assert that because the plaintiffs do not own property in or near the site of the proposed highway[24] and because they would suffer no financial loss or injury from its construction,[25] they do not meet the $10,-000 jurisdictional requirement. The defendants base their argument upon the holding in McGaw v. Farrow, 472 F.2d 952 (4th Cir., 1973) that "a claim not measurable in 'dollars and cents' fails to meet the jurisdictional test of amount in controversy."

■ The Court has serious doubt as to whether the potential injury that the

---

23. Affidavit of George W. Cheadle at 9; see Defendant RMA Ex. 19.

24. Deposition of Eugene B. Sydnor, President of the Canal Corporation, February 15, 1973, p. 5.

25. *Id.*, pp. 47–48.

plaintiffs allege in this case amounts to no more than "symbolic damages," such as were involved in *McGaw*. The Court need not consider this possible distinction, however, since the pecuniary result to the defendants of this litigation, or of the Rivers and Harbors Act claim by itself, might well exceed the $10,000 requirement. It is true, as agreed, that some courts hold that where the benefit to the plaintiff of a proposed injunction has a different value than the loss to the defendant, only the benefit to the plaintiff should be considered. The better approach, however, and one which has been adopted in appropriate circumstances in this circuit and to which this Court is bound is that a court may find jurisdiction from the viewpoint of either party. Government Employees Insurance Co. v. Lally, 327 F.2d 568 (4th Cir. 1964). This approach fulfills the purpose of the jurisdictional amount requirement of avoiding litigation of trivial cases. See C. Wright, Law of Federal Courts, 118–19 (2d ed. 1970). Moreover, even if the plaintiffs did not meet the jurisdictional amount requirement on its Rivers and Harbors Act claim, that claim arises out of the same factual situation as do the other federal claims. This Court may properly elect to exercise its pendent jurisdiction over the claim in order that the entire case might be disposed of in this proceeding. See 1 Barron & Holtzoff, Federal Practice and Procedure, § 23 (1960).

As to the plaintiffs' state constitutional claim, however, different considerations apply. While the Court undoubtedly has pendent jurisdiction to hear this claim under U. M. W. v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), that decision further provides that a district court has discretion to decide whether to hear such a claim. As it did in Ely v. Velde, C.A. No. 459–70–R (E.D.Va., Dec. 21, 1972), the Court elects not to hear this claim. Whether the conservation amendment to the Virginia Constitution creates substantive rights enforceable by private individuals is a difficult question of constitutional law and one on which the Virginia courts have not ruled. Although the Court could attempt to anticipate what answer the Virginia Supreme Court is likely to give to this question, it is disinclined to do so in this case, the reason being that the evidence required for the plaintiffs to prevail on their federal claims concerns only the question of federal involvement in the Downtown Expressway and whether federal statutory requirements have been met.[26] To prevail on the state claim, however, if one does exist, the plaintiffs would have to adduce massive evidence directed to environmental concerns. Such a claim could thus be as easily litigated in a separate action in state court as it could in the pending case. This fact, combined with the uncertain state of Virginia law on the claim, persuades the Court not to exercise its pendent jurisdiction over the claim, but instead to dismiss it.

## SOVEREIGN IMMUNITY

RMA asserts as one of its grounds of defense that it is a "political subdivision and public body corporate and politic of the Commonwealth of Virginia," and accordingly is immune from suit in federal court under the Eleventh Amendment. The Court concludes, however, that this claim is without merit. As a "political subdivision,"[27] the RMA enjoys the same status as a municipality[28] and is not, therefore, within the purview of the Eleventh Amendment. Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890). Even if it were, however, or even if its common law immunity would

26. As is discussed subsequently, the Court rejects and dismisses the federal constitutional claims made by the plaintiffs which might otherwise require the same sort of proof as would be needed for the Virginia claim.

27. Defendant RMA Ex. 5.

28. See Helms v. Richmond-Petersburg Turnpike Authority, 52 F.R.D. 530 (1971).

normally protect it from suit, the allegations are that RMA purposefully availed itself of the benefits of federal laws. This would constitute a waiver of sovereign immunity as to the requirements of the federal statutes involved. Finally, even if RMA were immune from suit in this Court, the defendant Cheadle is not, and the plaintiffs could secure their relief by seeking the Court to order his adherence to federal law. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L. Ed. 714 (1908); see Thompson v. Fugate, 347 F.Supp. 120 (E.D.Va.1972); La Raza Unida v. Volpe, 337 F.Supp. 221 (N.D:Cal.1971).

## STANDING

All of the defendants challenge the standing of the Canal Corporation to bring this action, on the theory that the organization and its members have not shown that they themselves will suffer actual injury by the acts of the defendants. While this argument has not been renewed since the addition of the plaintiff Deaton, the Court does not conclude that it has been made moot by the added party.

■ The requirement of standing is rooted in the case or controversy provision of Article III of the Constitution and seeks to ensure that parties involving themselves in litigation have such a personal stake in the action as to make it a true adversary one. The principal cases governing the sort of standing problem that is present here are Association of Data Processing Service Or-

ganizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), its tandem case, Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), and Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In *Data Processing,* the Supreme Court held that a party has standing to obtain judicial review under § 10 of the APA where he has alleged that the action under attack caused him actual injury in fact and where the alleged injury was to an interest "arguably within the zone of interests to be protected or regulated" by the statutory requirements to which the plaintiff seeks to compel adherence. 397 U.S. at 153, 90 S.Ct. at 830. In *Sierra Club,* the Court considered the meaning of the injury in fact requirement and reaffirmed its vitality. It concluded that while injuries other than economic ones can confer standing, an organization must allege that it or its members will be affected in their activities or pastimes by the allegedly illegal acts. A mere interest in a problem, regardless of how sincerely it might be held, is not sufficient to give standing to an organization or an individual. Such an organization may, however, have standing to represent its injured members. Sierra Club v. Morton, *supra,* 405 U.S. at 739, 92 S. Ct. 1361.[29]

■ The allegations in the complaint do not establish standing for the Canal Corporation on its own. All that is alleged is that the Canal Corporation's objectives are "the preservation of the

29. The Court in Sierra Club states that "[i]t is clear that an organization whose members are injured may represent those members in a proceeding for judicial review." This Court had not imagined the issue to be so clear. Generally, a party may assert only his own rights in litigation, not those of a third party. An exception to his rule was recognized in NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), where the assertion of their rights by the members of an organization would have had the effect of waiving those rights, and has been extended in certain other

first amendment cases. *E. g.,* NAACP v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), cited in Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368 (1972). The Court in *Sierra Club* seems to have adopted this same exception for cases such as that presently before this Court. Certainly, however, it would be restricted to those organizations whose purposes extend to the protection of the injured interests of their members. The James River and Kanawha Canal Parks, Inc., would fit this criterion.

environmental, historical, recreational and community value of the James River and Kanawha Canal" through such steps as the restoration of the canal, the creation of adjacent walkways, etc. There is no suggestion that the organization owns property near to or over which the Downtown Expressway will be located or that it intends to make use of the canal area, once restored, by sponsoring events in the area. Although its contact with the restoration of the canal is certainly more particularized than was that of the Sierra Club in Sierra Club v. Morton, it amounts to no more than a public interest in the development of the area. This interest is not sufficient to support standing. See Ward v. Ackroyd, 344 F. Supp. 1202 (D.Md.1972).

■ This conclusion does not result however, in the rejection of the Canal Corporation as a party plaintiff, for the Court holds that the individual plaintiff Deaton does have standing to bring this action and, under the rationale of *Sierra Club*, his interests may be represented by the Canal Corporation of which he is a member. Deaton alleges that he is a resident of the City of Richmond and that he has used and enjoyed the James River and Kanawha Canal for recreational activities and for its aesthetics and that he intends to do so to an even greater extent in the future if the acts of the defendants do not make this impossible. As unspecific as this allegation may be, it shows a personal involvement with the area affected by the Downtown Expressway and thus states an injury in fact sufficient to support standing. See Sierra Club v. Leslie Salt Co., 354 F.Supp. 1099 (N.D.Cal.1972); *contra,* Coalition for the Environment v. Volpe, 347 F.Supp. 634 (E.D.Mo.1972).

■ Having established that the plaintiffs' allegations show injury in fact to their interests resulting from the defendants' acts, it remains to be determined whether these interests are arguably within the zone of interests to be protected by the statutes in question.

See Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The defendants have not argued that the plaintiffs' interests are not so protected by the National Environmental Policy Act (NEPA), the relevant provisions of the Federal-Aid Highways Act (FAHA), the Department of Transportation Act (DOTA), and the National Historic Preservation Act (NHPA). The Court has no doubt that a user and enjoyer of resources allegedly protected by these acts is within their zone of protection. As to the Rivers and Harbors Act claim, however, the Court has considerably more doubt. It will defer discussion on this issue until it considers this claim *in toto.*

## LACHES

■ All defendants contend that the plaintiffs should be barred from prosecuting this suit by the equitable doctrine of laches. They contend that since the plaintiffs knew or should reasonably have known as early as 1966 that the proposed highway would cross the canal site they are estopped to bring the suit the day before the bond sale in 1973.

The record reveals that the proposed location of the Downtown Expressway was indeed made known to the public by a newspaper supplement in the fall of 1966.[30] Eugene B. Sydnor, president of the Canal Corporation and admittedly the prime mover behind this litigation, testified that he was generally aware of the plans at that time.[31] Whether the plaintiff Deaton had similar knowledge is not apparent from the record. Since the Canal Corporation, as representative of Deaton's interest, is the party actually prosecuting this litigation, however, the Court will look to its acts and those of its members in general in deciding the laches question. RMA further publicized the proposed location by a public meeting in November, 1966, at which time many members of the public appeared. Although there was severe crit-

30. Defendant RMA Ex. 7.

31. Depositions of Eugene B. Sydnor, p. 17.

icism of the highway's location from Davis Avenue to Linden Street, no mention was made of its effect on the canal in the downtown area. Sydnor did not attend this meeting nor, to his knowledge, did any of the other members of the plaintiff corporation.

The events that transpired from early 1968 until 1972 have been outlined previously. Suffice it to say, that the Canal Corporation did not come into existence until March 1972, and that neither Sydnor, Deaton nor any others who were to become members of the group took any steps to secure a location change until well after the proposed location had been made public. During this period, RMA expended approximately $15,000,-000 in acquiring right-of-way for the Downtown Expressway, ninety per cent of which was cleared. It also sponsored a bond sale of $51,300,000 to finance the Powhite Parkway, James River Bridge, and a portion of the Beltline Parkway, which sale seems to have been premised on the expectation that the downtown segment of the expressway system would eventually be constructed. This expectation was not an enforceable guarantee, however.[32]

The evidence in the record indicates that it was not until 1969 that members of the Canal Corporation first began to express their concern over the threat to the canal posed by the Downtown Expressway. Margaret W. Rucker, a member of the corporation, states by affidavit that during 1969 she began meeting with local officials and members of RMA.[33] She testified that the results of these meetings were encouraging and that she and her compatriots felt that some way of saving the canal might be found through the administrative and political process.

The catalyst to the actual litigation came with the formation of the Main-to-the-James Committee in February, 1971. This group was formed at the behest of Mayor Thomas J. Bliley and was charged with creating a long range plan for the development of the area south of Main Street, bounded by Belvidere Street on the west, the Richmond-Petersburg Turnpike on the east, and the south bank of the James River.[34] The Committee raised $100,000 from its members, by which it financed a study by a Philadelphia consulting firm. It also formed a Citizens' Advisory Committee to provide it input from the community, with Mrs. Rucker and Mrs. Eugene B. Sydnor, Jr., as its co-chairwomen.

In late 1971, the consulting firm presented its preliminary proposals, consisting of four scenarios for the development of the Main-to-the-James area. The major distinguishing factor of each of these scenarios was the location of the Downtown Expressway, with Scenario I postulating the construction of the highway as originally planned and with Scenario IV postulating the halting of the Expressway at Belvidere Street and its continuation through the Main-to-the-James area as a boulevard. A special meeting was held with the full committee on February 16, 1972, at which time the consulting firm, with the later support of the Citizens' Advisory Committee, recommended the adoption of Scenario IV. An estimate of the expense that would be involved in this and the other scenarios was made known on February 18, 1972, when a consulting

---

32. The definition of the project given in the official bond statement dated December 30, 1970, included segments running from the intersection of Parham and River Roads to the Richmond-Petersburg Turnpike " . . . substantially in accordance with plans and specifications on file with the Authority . . . " Def't. RMA Ex. 13, p. 17. RMA covered itself, however, by qualifying the above inclusion with the words "or such lesser portion thereof as the Authority should determine."

33. Affidavit of Margaret W. Rucker, filed March 12, 1973.

34. This history of the Main-to-the-James program derives primarily from the foreword to the Text of the Final Report of the consultants, dated December 13, 1972, filed as Appendix A to the affidavit of Robert P. Black, filed February 20, 1973.

firm hired by RMA submitted a report on estimated costs for the various alternatives to the Expressway and for the reconstruction of the James River and Kanawha Canal.[35] After some months of deliberation, the Main-to-the-James Committee rejected Scenario IV and concluded that the Expressway would have to be built as planned.

This same conclusion was reached by RMA in the summer of 1972, after negotiations with the Canal Corporation.[36] RMA did agree, however, in accordance with the recommendation of the Main-to-the-James Committee, to salvage stone blocks from the canal locks to be used in reconstructing a connection between the Haxall and the James River and Kanawha Canals that would preserve the navigable Tidewater Connection.

In order to sustain their defense of laches, the defendants must prove an unconscionable delay by the plaintiffs in bringing the action which has resulted in prejudice to them. Costello v. United States, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). The defendants' burden is especially difficult to bear in this case, since the claims are based upon statutory provisions which seek to preserve the environment. The Court of Appeals for the Fourth Circuit has recognized the special public importance of these ecology laws and has declined to invoke laches in a suit the facts of which resemble those here. Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir., 1972). The standard that it has applied is whether "the costs of altering or abandoning the proposed route would *certainly* outweigh the benefits that might accrue therefrom to the general public." 458 F.2d at 1329–1330 (emphasis included in original).

Although the record indicates that the plaintiffs could have been aware of possible damage to the canal as early as 1966, the Court concludes that they could not reasonably have been expected to have commenced this litigation until after the decision by RMA in the summer of 1972 not to shift the location of the highway in order to allow for full restoration of the canal. Since the litigation turns primarily upon federal involvement in the project, the plaintiffs certainly could not have begun the suit until April 24, 1970, the date on which the Federal Highway Administration gave its final approval to financing part of the Beltline Expressway as I-195.[37] Even after that date, however, the Court is convinced that the location of the highway was not so permanently established that it could not have been modified. The record reveals that RMA actively considered alternatives and that it engaged in serious discussions with the Canal Corporation until the summer of 1972. Had the Main-to-the-James Committee adopted the recommendation of the consulting firm that the Downtown Expressway be halted at Belvidere Street or that its route be shifted to preserve more of the canal,[38] the Court is reasonably satisfied that RMA might well have relocated or otherwise modified the route of the Expressway.[39] It follows therefore that until the summer of 1972, there was a very real possibility that the plaintiffs

---

35. Defendant RMA Ex. 19.

36. Deposition of George W. Cheadle, February 14, 1973, pp. 65–66.

37. Defendant RMA Ex. 10.

38. The record does not reveal the exact date of this decision. Appendix A (foreword) states only that it came several months after the February 16, 1972, meeting.

39. There is in the record, for example, a memorandum dated June 30, 1971 by Mr. E. J. Finn of the Federal Highway Administration. Finn had discussed with George W. Cheadle the effects which the Expressway would have on the canal and had found Cheadle quite receptive to the possibility of an alternative location for the highway in order to save the canal if the Main-to-the-James Committee so recommended and if feasible plans could be developed and financed. Plaintiffs' Exhibit 6, filed with deposition of H. C. King, at 3.

might well have secured their relief without the necessity of court action. Thus, although they could have brought this action as early as 1970, the plaintiffs were justified in delaying the litigation at least until mid-1972.

The Court has serious doubts as to whether the delay from mid-1972 until January 9, 1973, can be classified as unconscionable. Even if it could be so classified, however, the resulting prejudice to the defendants has not been so substantial as to justify barring the suit. The principal injuries resulting from the delay that the defendants assert in their memoranda are the expenditure of approximately $20,000,000 for right-of-way and the $51,300,000 bond issue for phase I of the expressway system. Both of these alleged injuries, while substantial, were incurred prior to mid-1972. The only prejudice that could have resulted to the defendants from the delay found by the Court was the expense incurred in setting up the bond sale for January 10, 1973. Rising interest rates and inflationary costs could also result, but both of these elements, while perhaps to be reasonably anticipated, are somewhat speculative in nature. Balancing all of the equities, together with the standard enunciated in *Arlington Coalition*, the Court must conclude that the plaintiffs should be allowed to prosecute their action.

## FEDERAL INVOLVEMENT

In order to sustain their claims under NEPA, FAHA, NHPA and DOTA, the plaintiffs must first prove that these statutes apply to the construction of the Downtown Expressway. A NEPA statement is needed only when there is present "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Federal action is typically present only when a project is wholly or partly federally funded. Similarly, the requirements of the highway statutes and the NHPA normally need not be met unless federal funding is approved to aid in construction of a highway.

It is admitted that the Downtown Expressway will not directly receive any federal funds. This fact alone is not dispositive however of the question of whether federal laws must be followed. Courts have recognized situations in which no federal funds have been authorized for a particular highway, yet the highway has, through various circumstances, taken on such a federal character that the purposes behind the federal laws would be defeated unless their requirements were met. It is this sort of federal involvement that the plaintiffs allege is present in regard to the Downtown Expressway.

The first federal contact with the Downtown Expressway, albeit tangential, came through partial federal funding of the Richmond Regional Area Transportation Study begun in 1964 and completed in 1968.[40] These Highway Planning and Research Funds are apparently granted to help states fulfill the requirements of 23 U.S.C. § 134 that any proposed highway within an urban area must be encompassed within a comprehensive transportation plan before federal funds can be allotted toward it. It by no means follows, however, that every urban highway encompassed within a given plan will receive federal funds.

As the Court has noted, original plans called for RMA itself to construct and finance through revenue bonds the entire expressway system. By 1967, however, RMA concluded that this was not feasible and began exploring alternative means of financing the project and, in late 1967 and 1968, entered into discussions with the Virginia Department of Highways, and subsequently the Federal Highway Administration (FHWA), concerning the possibility of federal aid for a portion of the project. On September 15, 1967, a meeting was held in Washington, D. C., to discuss the problem, with representatives of the Virginia Highway Department and the FHWA in

40. Deposition of Richard Torbik, February 15, 1973, at 18–19. See also, pp. 9–10.

attendance.[41] A similar meeting was held on June 24, 1968, this time with members of RMA present.[42] At the conclusion of the meeting, F. C. Turner, Director of the FHWA, suggested that the Highway Department forward a formal request for federal funds to the FHWA.

As a result of this suggestion, J. E. Harwood, Deputy Commissioner of the Highway Department, by letter dated July 2, 1968 to J. F. Sullivan, Division Engineer of FHWA, formally requested that interstate mileage which previously had been allotted to I-295, a beltway around Richmond, be transferred to a portion of the expressway system.[43] Harwood's request was for federal funding for the highway which had previously been designated as the major part of the Beltline Expressway, running from Bryan Park at the juncture of Interstates 64 and 95 north of Richmond to approximately the intersection of McCloy Street and Idlewood Avenue. It was requested that this road be constructed as a spur of Interstate 95 and be designated as I-195.

On September 17, 1968, Douglas B. Fugate, Commissioner of the Virginia Highway Department, wrote to F. C. Turner requesting a response to the July 2d letter.[44] This response came on October 17, 1968, in the form of a letter from Sullivan to Harwood. In it, Sullivan denied the request for the transfer of interstate mileage from I-295. He did not, however, respond to an alternative request made by Harwood on October 10, 1968,[45] that the highway in question be built as an interstate spur with additional mileage allotments that Congress had granted the FHWA in 1968.

Subsequently, the Virginia Highway Department and RMA began considera-

tion of a proposal that would have involved the FHWA directly in the Downtown Expressway. On October 28, 1968, Harwood wrote Sullivan that the Highway Department had under active consideration a proposed request of federal funding for the entire Downtown Expressway.[46] The formal request for this additional funding was made by letter dated November 13, 1968,[47] in which Harwood requested that Interstate Route 95, a major north-south artery, be rerouted over the Beltline and Downtown Expressways. The primary reason given for this request was to relieve congestion on the Richmond-Petersburg Turnpike, and the letter's emphasis suggests that the Virginia Highway Department considered the principal function of the Downtown Expressway to be as a link with the Beltline Expressway for the purpose of providing another limited access route through, rather than into, Richmond. RMA's resolution which formally requested the State to seek federal funds for the Downtown Expressway was forwarded to the FHWA on December 2, 1968.[48]

Strangely enough, the Court can find no further reference to this request for federal funding for the Downtown Expressway in the voluminous documentary record. In a deposition, however, F. C. Turner, the Director of the Federal Highway Administration at the time, stated that the FHWA did not have sufficient undesignated interstate mileage to fund the "entire loop," as he phrased it. He further testified that the State "made a request to us to divide the loop into two parts," with federal funding for the Beltline Expressway and local funding for the Downtown Expressway.[49] The Court cannot determine when that request was made, but on April 29, 1969,

41. Plt. Ex. 1, filed April 18, 1973.

42. Affidavit of Douglas B. Fugate, filed February 21, 1973, at 1; Deposition of Douglas B. Fugate, February 13, 1973, at 7–8.

43. Defendant Fugate affidavit, Ex. 1.

44. Defendant Fugate affidavit, Ex. 2.

45. Plt. Ex. 1, filed April 18, 1973.

46. Plt. Ex. 22, filed April 18, 1973.

47. Plt. Ex. 27, filed April 18, 1973.

48. Plt. Ex. 31, filed April 18, 1973, Plt. Ex. 32 is a copy of that resolution.

49. Deposition of F. C. Turner, February 20, 1973, pp. 11–14.

Fugate wrote a lengthy letter to Turner renewing his request for federal funds, solely for the Beltline Expressway.[50] This request for Beltline funding was finally approved on July 18, 1969.[51]

The apparent success of the Highway Department's request for federal funding was tempered by virtue of a communication dated July 31, 1969. On that date, J. F. Sullivan of FHWA wrote to Fugate expressing his understanding that the grant of federal funds was made upon the condition that the Downtown Expressway would be constructed "to Interstate standards and is to be operative concurrently with or prior to completion of the I-195 spur."[52] On the same day that he received this letter, Fugate wrote to Turner expressing his concern over the condition which Sullivan had placed on federal funding.[53] Fugate stated that the current condition of the bond market might require a delay in the issuance of bonds by RMA and thus might make it impossible for the expressway to be constructed concurrently with the I-195 spur. He further expressed his fear of the public embarrassment which the announcement of this condition might well cause.

Turner did not respond to Fugate's letter until November 6th, 1969. In his letter of that date, Turner expressed his belief that the Downtown Expressway and I-195 "complemented" one another and that their concurrent availability was necessary to assure an efficient use of each of them. He welcomed Fugate's further thoughts on the matter.[54]

Fugate readily accepted this invitation. On November 10, 1969, he wrote Turner again requesting that the condition imposed by the July 31, letter be dropped. He stated that "even without the construction of the southeasterly extension [Downtown Expressway], this spur of I-95 would connect to major streets in the city and would be of immense value in the relief of traffic congestion."[55] No immediate response to this letter was forthcoming.

Subsequent to the November 10 letter, RMA developed an alternative proposal which it hoped would satisfy the federal officials. This proposal called for the construction of the Powhite Parkway and the James River Bridge to connect with the Chippenham Parkway concurrent with I-195. A meeting was arranged on March 27, 1970, to discuss this proposal as an alternative to the Downtown Expressway condition on federal funding,[56] and on April 3, 1970, Fugate formally requested such an alternative.[57] On April 24, 1970, Turner approved this request.[58] In his letter, he stated the following:

We concur that the construction of I-195 and the toll-highway segment south to S.R. 150 will complete a useable highway facility. We, therefore, withdraw Mr. Sullivan's July 31, 1969, condition of approval and substitute the following:

The approval of the addition of Interstate Route 195 is given with the understanding that the freeway route extending the highway facility south to S.R. 150 will be scheduled for construction and completed concurrently with I-195.

Additional communications between the federal and state defendants were made subsequent to the final approval of federal funding for the Beltline Expressway embodied in the April 24th letter. One set of letters concerned the possibility of bringing the Downtown Expressway within the Federal-Aid Highway System and numbering it as I-195, the same as the spur to be financed by federal funds. The initial

50. Defendant Fugate affidavit Ex. 4.

51. Defendant Fugate affidavit, Ex. 5.

52. Defendant Fugate affidavit, Ex. 6.

53. Defendant Fugate affidavit, Ex. 7.

54. Defendant Fugate affidavit, Ex. 8.

55. Defendant Fugate affidavit, Ex. 9.

56. Fugate affidavit, filed February 21, 1973, at 3.

57. Defendant Fugate affidavit, Ex. 10.

58. Defendant Fugate affidavit, Ex. 11.

proposal to this effect was made by J. E. Harwood in a letter dated January 19, 1972.[59] In that letter, Harwood requested that the FHWA add the Downtown Expressway to the interstate system pursuant to 23 U.S.C. §§ 129(b) and 139. Under this provision, no federal funds are provided for construction or maintenance,[60] but the roads are designated as a part of the interstate system and numbered accordingly. Harwood cited seven reasons to support his request, but they may be summed up by his statement that "[w]e believe the continuation of the numbering of Interstate Route 195 over the Richmond Metropolitan Expressway to be essential to a unified and connected Interstate System in the Richmond Metropolitan area."

H. C. King responded to Harwood's request on March 16, 1972, outlining the steps that would have to be taken to make the Downtown Expressway a part of the interstate system.[61] After receipt of this letter, the Highway Department and RMA apparently decided that the request should be deferred until after the construction of the Expressway. One fear expressed by Harwood was that "the inclusion of this entire route in the Federal Aid System would mean the possibility of the imposition of Federal regulations, and we might get involved in the environmental considerations, etc." [62]

In addition to the federal funding of the Beltline Expressway, the plaintiffs argue that there is federal involvement in the Downtown Expressway by virtue of the decision by the state and city defendants to fund the construction of the McCloy to Meadow Connector. The record reveals that the Virginia Highway Department agreed in 1972 to fund this segment of the highway if the City of Richmond would contribute fifteen per cent. By letter of December 19, 1972, the City agreed to advance the funds necessary for the construction in accordance with the proposed plan.[63]

According to the testimony and affidavit of Douglas Fugate, no federal funds will be used in the construction of this section of highway. Non-interstate federal aid highway funds, which can be used to finance fifty per cent of a highway project, could have been used to pay for the McCloy to Meadow Connector. Apparently, the decision as to which roads within a state will be financed with federal funds, and thus must meet the requirements of federal law, is a decision entirely within the discretion of state highway officials. Commissioner Fugate was candid in admitting that, wherever possible in Virginia, federal funds are used on rural rather than urban projects because there is likely to be more environmental controversy over urban projects and the federal law requirements may thus be more difficult to meet than they would be in a rural area.[64] In the case of the McCloy to Meadow Connector, this policy was followed, and the Highway Department has elected to use only state and local funds.

Upon a thorough examination of the entire record, the Court must conclude that there is an unresolved question of fact as to whether federal funds would have been approved for I-195 had the FHWA not anticipated that the Downtown Expressway would eventually be built. It is true that in his deposition, Francis C. Turner, Director of the

---

59. Plaintiffs' Ex. 9, filed with Fugate deposition.

60. Federal aid funds may, however, be used for the reconstruction of such highways. 23 U.S.C. § 139(b). If they are, the requirements of federal law would have to be met before reconstruction could proceed.

61. The Court cannot discover this letter in the record, though it is referred to in Plaintiffs' Ex. 4, filed with the Cheadle deposition. Presumably, the content of this letter is much the same as the memorandum comprising Defendant Fugate's Exhibit List, Ex. 5.

62. Letter to A. J. Brent, General Counsel to RMA, dated April 20, 1972 (Plaintiffs' Ex. 4, filed with Cheadle deposition).

63. Defendant Fugate affidavit, Ex. 14.

64. Fugate deposition, February 13, 1973, at 39–40.

FHWA, suggests that there was sufficient justification for the construction of the spur even in the absence of the Downtown Expressway.[65] He does not, however, state flatly that I-195 would have been approved for federal funding if there had been no plans for a southeasterly extension of it to connect with I-95. The record strongly suggests that this extension was a major factor underlying federal funding. Indeed, it was originally felt to be so important that the FHWA demanded that it be constructed concurrently with the federal road. Even though this condition was subsequently removed, the record reflects assurances that the Expressway would eventually be built. For example, in his letter of July 31, 1969, urging the removal of the condition of concurrent construction, Douglas Fugate stated to F. C. Turner that "we know beyond any doubt that the Authority will build the expressway."[66] In light of such assurances, the Court cannot say that the ultimate construction of the Downtown Expressway did not remain an important and perhaps crucial factor in the funding decision. Accordingly, for purposes of this motion, the Court will assume that federal funds would not have been forthcoming for I-195 had the FHWA not anticipated that the Downtown Expressway would be constructed to link I-195 to I-95.

The plaintiffs advance a two-pronged argument in support of their contention that there is sufficient federal involvement in the Downtown Expressway to require adherence to federal law. First, they argue that RMA and the Virginia Highway Department each have maintained the option of securing federal funds in the future for the Downtown Expressway and the McCloy to Meadow Connector, respectively, and that the preservation of this possibility for federal funding is sufficient to require that federal statutory requirements be met. La Raza Unida v. Volpe, 337 F.Supp. 221 (N.D.Cal.1971); Sierra Club v. Volpe, 351 F.Supp. 1002 (N.D.Cal.1972). Second, the plaintiffs argue that the entire Richmond Expressway system is an integrated, interdependent system and that the federal involvement in the original planning of the whole system and in one major highway is sufficient to make the entire system federal in nature. The cases cited for this proposition are Named Individual Members of the San Antonio Conservation Soc. v. Texas Highway Department, 466 F.2d 1013 (5th Cir. 1971) and Thompson v. Fugate, 347 F.Supp. 120 (E.D.Va.1972). The Court will consider these arguments separately.

In La Raza v. Volpe, 337 F.Supp. 221 (N.D.Cal.1971), the district court was called upon to decide at what stage in the lengthy process of highway planning and construction a given project becomes federal in nature. The court concluded that the requirements of federal law must be met once the FHWA gives location approval to a highway pursuant to FAHA. This is so even though local authorities have not yet requested federal funds at the time of this approval and, indeed, may never actually request federal funds for the project. Finding the congressional concern for the environment as reflected in the relevant statutes to be very strong, and the possibility of avoiding the requirements of federal law to be very real, the Court concluded that "[t]he state should not have the considerable benefits that accompany an option to obtain federal funds without also assuming the attendant obligations." 337 F.Supp. at 227.

In Sierra Club v. Volpe, 351 F.Supp. 1002 (N.D.Cal.1972), the same district court had the opportunity to consider how the rationale of La Raza Unida applied in a case in which local highway authorities had by their acts already given up the option of securing federal funds. The record in Sierra Club revealed that both state and federal highway officials had complied with federal

---

65. Turner deposition, February 20, 1973, at 13–14, 16.

66. Defendant Fugate affidavit, Ex. 7.

law requirements for more than ten years in order that the state might, if it so desired, secure federal funds. At the last moment (indeed, after litigation had begun), federal aid was waived. Notwithstanding the fact that no federal funds would be available for the highway project, the court held that this last minute waiver "should not be made a ground for disclaiming the federal nature of the project where it appears that the purpose is to avoid compliance with federal statutory environmental requirements." 351 F.Supp. at 1007.

This Court is in full accord with the results in *La Raza Unida* and *Sierra Club*. The administration of federal highway trust funds greatly resembles the block grants of the Law Enforcement Assistance Administration with which the Court was concerned in Ely v. Velde, C.A. 459–70–R (E.D.Va., Dec. 21, 1972.) [67] Virginia, for example, will receive approximately $30,000,000 of federal money in 1973 for primary road construction, which money will go into a general pot along with state funds. If a given project is denominated as federal, half of its costs will be paid for from the $30,000,000 in federal money and the relevant statutory requirements will have to be met. The decision as to which highways will or will not be federally aided is entirely within the discretion of state highway authorities. Even after a given project is classified as federal, however, the nature of the operation of the funds allows simple bookkeeping shifts to avoid the requirements, of federal law. As occurred in *Velde*, for example, a state might secure final federal approval and then, realizing that statutory requirements might be too difficult to meet, repudiate the funds for that project. Such funds would not be lost, however, but could be used on another project where the federal requirements could be met more easily. This procedure would in effect allow highway authorities to avoid taking environmental considerations into account for those

projects in which the environment may be most seriously harmed. Such a result unquestionably is counter to, and, indeed, defeats, the strong environmental policies expressed by Congress in NEPA and in the highway statutes. Named Individual Members of San Antonio Conservation Soc. v. Texas Highway Department, 446 F.2d 1013, 1027 (5th Cir. 1971); Ely v. Velde, C.A. No. 459–70–R (E.D.Va., Dec. 21, 1972); see Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972).

In addition to the problems which block grants may pose, the court in *La Raza Unida* doubtless was also concerned with the possibility that state highway officials might not declare a project to be federal until so late in the planning process that the ability to meet federal requirements would be impaired. An environmental impact statement under NEPA, for example, must be made early in the highway planning process to have an optimal effect. Although the FHWA would not approve a project where the federal law requirements are not met, there is no set time at which, for example, a NEPA statement must be made. The FHWA might well approve a project for which one is drawn up, but done so later than would normally be desirable. The Court in *La Raza Unida* no doubt sought to avert this problem by declaring a project to be federal early in the planning process.

For one or both reasons, therefore, courts have concluded that highway projects must become irrevocably federal at some point prior to actual construction in order that the requirements of federal law not be diluted. *La Raza Unida* held that the federal imprimatur attaches early in the planning process, when federal approval is given to the location of a highway. As long as location approval is requested and granted and as long as all other conditions to federal funding have been met, then under *La Raza Unide* the project is federal. This Court, however, need not decide

67. See deposition of Douglas Fugate, Feb. 13, 1973, pp. 39–41.

**634**

whether the federal imprimatur attaches as early as was held in *La Raza Unida*. The record in this case is overwhelming to the effect that the Downtown Expressway and the McCloy to Meadow Connector were never considered to be federal.

 Notwithstanding the fact that *La Raza Unida* declared a highway project to be federal early in the planning process, it most assuredly did not hold that a project could be federal where no federal participation had ever taken place. This is so even if the possibility existed for securing federal funds in the future. The record reveals no federal participation in the planning of either the Downtown Expressway or the Mc-Cloy to Meadow Connector, other than the regional planning funds granted for the 1964 study, to which little significance should attach, that would suggest that federal funds may be available in the future. Quite to the contrary, the FHWA disapproved the possibility of federal financing for these roads. Although it would appear that the public hearing held on November 8, 1966, would satisfy the requirements of federal law, no use was ever made of this hearing that resulted in federal approval for the roads. No possibility exists for federal funds for the Downtown Expressway, since RMA is committed to building that highway as a toll road which precludes it from being given federal funds in the future.[68] Similarly, though the record does not indicate whether the McCloy to Meadow Connector is to be operated as a toll facility, there is no suggestion that the Highway Department or the City of Richmond in any way sought federal approval of the preliminary plans in order to preserve the possibility for future use of federal aid funds. The fact that the Highway Department may not have taken affirmative steps which would prevent the future use of federal funds certainly does not make the Connector federal. The Highway Department has the discretion

to use only state funds if it desires, and, as long as it does not take steps to preserve future federal funding, the highway is not subject to federal law. Douglas Fugate's stated reasons for not using federal funds in this case, to avoid environmental controversy is irrelevant, at least until some federal participation in the planning process takes place. None has been shown here.

 The plaintiffs seek also to establish federal involvement in the Downtown Expressway by means of the "project splitting" theory. This terminology stems from the use of the word "project" in the highway acts' requirements that the Secretary of Transportation not approve for the allocation of funds any federal project which has not met all of the relevant statutory requirements.[69] The project concept has been found useful by the courts considering highway cases and has been extended to define "federal action" under NEPA in these cases. Simply stated, the theory holds that state and federal highway authorities may not avoid the requirements of federal law by splitting what is in essence a single, federal project into several segments and funding certain of those segments with state funds only. See Named Individual Members of San Antonio Conservation Soc. v. Texas Highway Dept., 446 F.2d 1013 (5th Cir. 1971); Thompson v. Fugate, 347 F. Supp. 120 (E.D.Va.1972); Sierra Club v. Volpe, 351 F.Supp. 1002 (N.D.Cal. 1972). The Court agrees with the first premise which the plaintiffs must establish in order to prove that the defendants have segmented a federal project: the highways comprising the Richmond expressway system are perceived by their planners as unified and interdependent, each relying upon the others for its most efficient use. This conclusion does not mean, however, either that the roads comprise a single project as courts have used that term or that, if there is a project, it is federal.

68. 23 U.S.C. § 301.

69. *E. g.*, 23 U.S.C. § 138.

In *San Antonio Conservation Society* and, to a lesser extent, in *Thompson,* the highways in question were clearly a segment of a larger project. The North Expressway into San Antonio was a single, limited access highway that had from its inception been viewed as such. To avoid the requirements of federal law, the Texas Highway Department had simply cut out a middle portion of the road and declared it to be a separate segment from its two ends for purposes of compliance with federal law. In Thompson v. Fugate, *supra,* 347 F.Supp. 120, this Court was confronted with a limited access beltway around the City of Richmond, over 85% of which was financed with federal funds. The Court held that an 8.3 mile segment of this 75 mile highway could not be viewed as other than federal in nature, particularly given the geographic location of the roads, financed with federal funds, which the segment in question joined.

 There is no easily defined test which this Court can apply in order to determine whether I-195 and the Downtown Expressway should be viewed as a single project, split into segments. Certainly, not every state road whose construction has the effect of increasing the efficient use of a proposed federal road, thus making the construction of that federal road more likely, becomes federal in nature. As F. C. Turner testified, only about one quarter of all the streets and roads in the United States receive federal funds, and consequently virtually all of them must be integrated with locally funded roads.[70] Such integration is different only in degree, not in kind, with the sort of integration of road segments which one would classify as a single project. In order to determine, therefore, when a group of segments should be classified as a single project for purposes of federal law, a court must look to a multitude of factors, including the manner in which the roads were planned, their geographic locations, and the utility of each in the absence of the other. Any acts of the defendants that suggest that they may have decided to treat the roads separately in order to avoid the requirements of federal law will weigh very heavily in support of the project splitting theory. As to weighing the utility of each road in the absence of the other, the Court notes that it does not sit as a traffic expert to determine when one will be efficient if the other is not built. However, if the Court concludes that the two highways each have such little value in their own right that their separate construction could be considered arbitrary or irrational, the Court will find them to be a single project.

 Upon the undisputed facts in the record before it, the Court cannot conclude that I-195 and the Downtown Expressway constitute a single, unified project. Certainly, the record does not reveal any attempts by the defendants to divide the expressway system into segments to avoid the requirements of federal law. The system was always conceived of as being local in nature, and its division into different highways reflects both geographic differences and varying traffic needs. It is certainly true that the system was planned as a whole, to meet the overall traffic needs of Richmond in the latter half of the twentieth century. Each component of the system was designated with the other component in mind, so that maximum efficiency could be derived from each road. Yet, the individual highways were not planned as parts of one another nor as a part of a larger, single highway. It is also accurate to conclude that certain letters in the record reflect a conception held at one time by J. E. Harwood and perhaps shared by others, of I-195 and the Downtown Expressway, as a single, inner city loop connecting north and southbound through traffic. This view, however, does not seem to have guided the final planning of the two highways. Instead, I-195 gained final approval only after there were assur-

70. Turner deposition, pp. 32–33.

ances that a connection to southwest Richmond would be established. It would thus appear that the entire planning focus shifted, if indeed it ever did occupy the position suggested by Harwood's letter.

More importantly, the Court is convinced that both I-195 and the Downtown Expressway serve rational needs in their own rights, apart from traffic feeding from one another. The Downtown Expressway serves a clearly rational purpose in providing commuter access between the highly populated west and southwest parts of Metropolitan Richmond and the downtown area. Fully two-thirds of the traffic projected along this road that will travel as far as Lombardy Street will be destined for the downtown area, rather than through that area.[71] Similarly, the Court concludes that I-195 has sufficient value to Richmond traffic patterns in the absence of the Downtown Expressway to be considered a separate project. By connecting with the Powhite and Chippenham Parkways, this road provides an access route from a major portion of the Richmond residential area to the main traffic artery north. Even if, as the Court assumes, traffic along I-195 in the absence of the Downtown Expressway would be so light that federal authorities in the exercise of their discretion, would not have allocated funds for it, the Court cannot conclude that traffic would be so light that a decision to fund the road could be considered irrational or arbitrary. Turner's testimony clearly shows that there was a valuable purpose to I-195 standing alone, as does the fact that FHWA agreed to fund the road without firm, legal assurance that the Downtown Expressway would eventually be built. In sum, the two roads, standing separately, are rational and can properly be viewed as independent projects. The Court concludes, therefore,

that there has not been project splitting to avoid the requirements of federal law.

■ Moreover, even if the Richmond expressway system could be viewed as a single project, it would not be considered a federal one. The Court agrees with the conclusion of the district court in Civic Improvement Comm. v. Volpe, 4 E.R.C. 1160, 1161 (W.D.N.C. Mar. 24, 1972), aff'd. per curiam, 459 F.2d 957 (4th Cir. 1972), that " 'the effect of many federal decisions about a project or complex of projects can be individually limited but cumulatively considerable' and that an environmental statement should be required if it is 'reasonable to anticipate a cumulatively significant impact on the environment from the federal action.' " In this case, however, the plaintiffs have not shown sufficient federal contacts with the expressway system for the Court to conclude that it is federal. As previously stated, the entire system was originally scheduled to be financed by revenue bonds, without aid from federal sources. It was only by reason of rapidly rising costs that a request for federal funds for one part of the system was deemed necessary. The system never became imprinted with the federal imprimatur, but rather remained almost totally local in character.[72] The Court can find no attempt on the part of the defendants to benefit the entire system with federal aid, while avoiding federal statutory requirements.

Plaintiffs have not shown sufficient federal involvement in the planning and construction of the Downtown Expressway, hence federal statutory requirements need not be met prior to its being built.

RIVERS AND HARBORS ACT CLAIM

The plaintiffs further allege that the defendants have not met the requirements of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401, 403, by failing to

---

71. Plt. Ex. 1, filed April 12, 1973, p. 6.

72. The use of some federal planning funds is much too miniscule an involvement to

change this result. See Civic Improvement Comm. v. Volpe, 4 E.R.C. 1160 (W.D.N.C. Mar. 24, 1972), aff'd. per curiam, 459 F.2d 957 (4th Cir. 1972).

secure the approval of the Corps of Engineers of the United States Army for the proposed construction over the James River and Kanawha Canal. The Court takes the plaintiffs' contention to be that two permits are required, one for the scheduled rupture of the subterranean walls of the canal and basin and the other for any supports extending into the river or canal that might be needed for the ramp connecting the Downtown Expressway to the Richmond-Petersburg Turnpike. The defendants respond with arguments that the Rivers and Harbors Act does not create a cause of action enforceable by private litigants and that, even if it does, the James River and Kanawha Canal is not a navigable water within the meaning of the statute at the point at which it must be breached. They further claim that the issue is not ripe for determination, on the theory that the final plans for the Downtown Expressway have not been completed and that they need not secure a permit until these plans are finalized.

■ Initially, the Court must consider the question previously deferred of whether the plaintiffs have standing to raise a Rivers and Harbors Act claim. Once again, the Canal Corporation itself has not alleged potential injury in fact to give it standing to sue. As to the plaintiff Deaton, however, the issue is whether the interests that he has alleged are within the zone of interests arguably protected by the Rivers and Harbors Act, Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), or, as normally phrased in actions other than those under the Administrative Procedure Act, whether there is a "logical nexus" between the status which he asserts and the claim which he seeks to adjudicate. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d

947 (1968). The crucial allegation by Deaton is that he "has used the James River and Kanawha Canal for recreational activities." If such activities include boating on the canal, then Deaton would unquestionably have standing to sue. Even if they did not, however, the Court concludes that the recognized purposes of the Rivers and Harbors Act are broad enough to encompass the aesthetic, recreational and historic values that Deaton alleges. The Court thus agrees with the Court of Appeals for the Ninth Circuit that a plaintiff such as Deaton has standing to sue under the Act. Alameda Conservation Association v. California, 437 F.2d 1087 (1971).

■ As to the ripeness argument, the Court concludes that it is well taken as to the claim that a permit is needed for the ramp supports leading to the Richmond-Petersburg Turnpike which may be placed in the canal or river. The record reveals that plans for an interchange between the two highways have not been finalized, and thus it cannot yet be known whether the ramp will actually cross the canal. It is the testimony of George W. Cheadle that once the exact location of the road is known, RMA will discuss with the Coast Guard whether or not a permit will be needed.[73] If it is, RMA proposes to secure one at that time, and there seems to be little doubt that such a permit would issue.[74] That one would not issue, however, is a risk which RMA has the right to take.

■ The plaintiffs' claim is ripe, however, as to the portion of the expressway which, under present plans, will strike the subterranean canal structure between Seventh and Eleventh Streets. The record reveals that the walls of the filled canal, though presently covered with buildings and parking lots, still stand in this area of downtown Richmond.[75] Cheadle testified that

73. Deposition of George W. Cheadle, Feb. 14, 1973, pp. 75–76.

74. The Corps issued such a permit in 1955 for the construction for supports for the Turnpike in the river and canal. Defendant, RMA, Ex. 12. See Defendant

RMA Ex. 17–M. This approval indicates that navigation probably would not be affected by the proposed supports.

75. Deposition of Eugene B. Sydnor, Jr., Feb. 15, 1973, p. 32.

while location changes might occur from Eleventh Street eastward, there is little chance that they will be made as far west as Seventh Street.[76] Moreover, the only implication to be drawn from his testimony is that RMA does not feel that it is legally required to secure a permit for sections of the canal that are now covered and that it does not intend to apply for one.[77] Under such circumstances, the Court concludes that the plaintiffs' prayer for injunctive and declaratory relief is ripe, even though RMA could subsequently decide to apply for a permit.

Concluding that the plaintiffs may assert their Rivers and Harbors Act claim at this time, it remains to be determined whether they are entitled to relief. The first issue is the basic one of whether the Rivers and Harbors Act creates a civil cause of action in favor of a private party allegedly injured because of a violation of the Act.

The Court commences its quest with the recognition that a private party who suffers injury from the act of another, which act is in violation of the requirements of a federal statute, is normally entitled to civil redress for his injury, unless that statute expressly prohibits such actions or unless the maintenance of such actions would interfere with the operation of the statutory scheme. This rule of law stems from a sound public policy of allowing an innocent party to be compensated for, or otherwise protected from, harm caused to

him by the illegal acts of another. It is supported by, if not actually the basis of, the United States Supreme Court's opinion in Bivens v. Six Unknown Named Agents, 403 U.S. 388, 397, 91 S. Ct. 1999, 29 L.Ed.2d 619 (1971).[78] The underlying policy falls however when the illegal act performed by the defendant is in violation of a statute whose scheme of enforcement is such that it will be interfered with by allowing a private cause of action or where there is a clear congressional purpose not to allow private remedies for the violation of the statute's requirements. The defendants argue that the Rivers and Harbors Act is such a statute. It is claimed that the Act's enforcement scheme, which includes a provision for civil actions by the United States Attorney, is the exclusive means by which a violation of the Act's requirements may be raised.

The Court agrees with the defendants' position to the extent that it concerns private *enforcement* of the Rivers and Harbors Act. The opinion of the Court of Appeals for the Second Circuit in Connecticut Action Now, Inc. v. Roberts Plating Co., 457 F.2d 81 (1972), is highly persuasive of the view that the Act does not allow an individual to maintain a *qui tam* action prior to conviction or to sue for an injunction on behalf of the general public. But this does not address the issue of whether a private individual may bring a civil action to redress or prevent a specific injury to him caused by conduct that violates the statutes. Indeed, the Court in *Connecticut*

---

76. Deposition, Feb. 14, 1973, pp. 77–78.

77. *Id.* at 77.

78. The Supreme Court expressed this proposition thusly:

Finally, we cannot accept respondents' formulation of the question as whether the availability of money damages is necessary to enforce the Fourth Amendment. For we have here no explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of

Congress. The question is merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts. *Cf.* J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); Jacobs v. United States, 290 U.S. 13, 16, 54 S.Ct. 26, 78 L.Ed. 142 (1933).

403 U.S. at 397, 91 S.Ct. at 2005; But see Red Star Towing and Transportation Co. v. Department of Transportation, 423 F.2d 104 (3d Cir. 1970).

*Action Now* expressly reserved opinion on this question. 457 F.2d at 89.

The relevant enforcement provisions in the Rivers and Harbors Act are 33 U.S.C. §§ 406 and 413. Section 406 provides that whoever violates sections 401 and 403 shall be guilty of a misdemeanor and further provides that injunctive actions may be maintained by the Attorney General for the purpose of removal of structures erected in violation of the statute. Section 413 establishes a duty upon the Attorney General "to vigorously prosecute all offenders," stating that "[t]he Department of Justice shall conduct the legal proceedings necessary to enforce the provisions of sections 401 [and] 403." It is this last phrase, in particular, that has been interpreted to place all enforcement responsibilities in the hands of federal authorities.

The courts that have considered the issue of private causes of action under the Rivers and Harbors Act have expressed divergent views. The Court of Appeals for the Third Circuit has held that the enforcement scheme is exclusive, Red Star Towing and Transportation Co. v. Department of Transportation, 423 F.2d 104 (1970), while in the Ninth Circuit, it has been held that the Rivers and Harbors Act creates private causes of action, Alameda Conservation Assoc. v. California, 437 F.2d 1087 (1971), as interpreted by Sierra Club v. Leslie Salt Co., 354 F.Supp. 1099 (N.D. Cal.1972). Although public enforcement actions are prohibited in the Fifth Circuit, Bass Anglers Sportsman Soc. v. United States Steel Corp., 324 F.Supp. 412 (N.D., Md. and S.D.Ala.), aff'd. per curiam on the opinion below, 447 F.2d 1304 (5th Cir. 1971), the right of private individuals to redress specific injuries does not appear to be questioned. Neches Canal Co. v. Miller & Vidor Co., 24 F.2d 763, 765 (5th Cir. 1928); see Puente de Reynosa v. City of McAllen, 357 F.2d 43 (5th Cir. 1966). In this circuit, a district court has found that the Rivers and Harbors Act does allow for private causes of action, but its affirmance in part by the Court of Appeals for the Fourth Circuit does not rest on this holding. Lauritzen v. Chesapeake Bay Bridge and Tunnel District, 259 F.Supp. 633 (E.D.Va.1966), aff'd. 404 F.2d 1001 (4th Cir. 1968).

Upon a thorough examination of both the relevant cases and the entire statutory scheme of the Rivers and Harbors Act, the Court concludes that a party should be allowed to seek private civil redress for the creation of obstructions to navigable waters without the approval of the Corps of Engineers which result in specific injuries to that party. The Rivers and Harbors Act contains no express prohibition of private causes of action, nor can the Court detect any implied prohibition. In addition, the pursuit of civil remedies for private violations does not in general interfere with the enforcement scheme of the Rivers and Harbors Act. It may be that an injunction ordering the removal of an already constructed obstruction is not available to a private litigant, since this form of relief approaches closely the civil remedy given to the United States. The Court can well see how the hardship which such a removal would normally involve might well have prompted Congress to have phrased the statute so that only the United States, in its discretion, might apply for such relief. An injunction against planned construction, such as that involved in this case, does not suffer from such infirmities, however. Moreover, no enforcement provisions are provided to stop the construction of a planned construction before it begins. A private injunction at this stage could not, therefore, interfere with federal enforcement of the act or in any way encroach upon prosecutorial discretion. The Court concludes that such an injunction may, upon proper showing, issue at the instigation of a private person.

Finally, the Court must decide whether the proposed acts of the defend-

ants will in fact be violative of §§ 401 and 403 of the Rivers and Harbors Act. In order to sustain their burden, the plaintiffs must establish by the appropriate degree of proof, that the James River and Kanawha Canal between Seventh and Eleventh Streets in Richmond is a navigable water of the United States. The plaintiffs have failed to meet this burden.

■■■■■ The plaintiffs have relied primarily upon Appalachian Electric Power Co. v. United States, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940). In that case the Supreme Court was faced with the question of whether the New River in Virginia was navigable, thus requiring the Appalachian Power Company to secure a license for the construction of a dam across it under the Rivers and Harbors Act, 33 U.S.C. §§ 401, 403, and the Federal Water Power Act, 16 U.S.C. § 791a, et seq. While the Court did not reject the older definition that to be navigable in law, a waterway must be navigable in fact, The Daniel Ball, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871), it did embellish that standard considerably. The Court held that a waterway, "otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken." 311 U.S. at 407. If the waterway in its natural state was once navigable, the fact that it is not usable for modern ships does not render it non-navigable, at least where it can be rendered usable by improvements. 311 U.S. at 408; Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S. Ct. 409, 65 L.Ed. 847 (1921). Furthermore, artificial obstructions to actual navigation such as bridges do not prevent a waterway from being regarded as navigable in law. Economy Light &

Power Co. v. United States, *supra*, 256 U.S. at 118, 41 S.Ct. 409.

Notwithstanding the language in *Appalachian Power* and *Economy Light & Power*, this Court cannot overlook the simple fact that the geographic entity in question in this case is a parking lot, and a parking lot, despite the most sophisticated legal arguments, buttressed by the most vivid of imaginations, is not a navigable water of the United States. The record in this case reveals that the portion of the James River and Kanawha Canal in downtown Richmond was filled in and abandoned as early as 1880, even before the Rivers and Harbors Act was enacted.[79] Quite simply, it ceased to exist as a waterway. Unlike the rivers involved in the previously cited cases, the canal did not continue to flow in a "natural state" which could be improved to make it navigable. It in fact did not flow at all, as the water was drained from it and the canal filled with dirt. To be made a navigable waterway the canal could not merely be improved, but would have to be entirely reconstructed, including the addition of a most necessary element—water. It does not therefore, fall within the sort of waterways with which the Supreme Court was concerned in *Appalachian Power* or *Economy Light & Power*, which continued to exist as rivers but had become obsolete for navigation. Under no conceivable interpretation of the concept of navigability could the portion of the James River and Kanawha Canal in downtown Richmond, filled and covered, be considered a navigable waterway. Accordingly, the defendants are entitled to their motion for summary judgment on the plaintiffs' Rivers and Harbors Act claim.

### CONSTITUTIONAL CLAIMS

The plaintiffs allege that the acts of the defendants violate their rights under

---

79. Defendant RMA 16–I, at 46–47; see Reply Brief of Richmond Metropolitan Authority, filed March 15, 1973, at 9–13.

the Fifth, Ninth and Fourteenth Amendments to a clean, nondegraded environment. As important as an unpolluted environment may be and indeed is to us all, no court has gone so far as to say that an individual has a fundamental right under the Constitution to a clean environment which can be impaired only upon a showing of a compelling state interest. This Court declines to participate in any such judicial lawmaking. See Ely v. Velde, 451 F.2d 1130, 1139 (4th Cir. 1971).

## CONCLUSION

The conclusion herein reached does not stem from the Court's opinion as to whether the Downtown Expressway is or is not a desirable undertaking, but rather from the Court's conception of the applicable law. The protection of our environment and of our places of historical interest are of the utmost importance, yet, the decision as to how to protect them must come from the Congress of the United States and the legislatures of the various states. Where, as here, highway planners meet all of the requirements of law applicable to them nothing further is required. In view of the Court's conclusions, defendants' request for security is moot.

To the end, hopefully, that the matters referred to herein may be more readily understandable to an appellate court, the Court appends hereto a copy of the plan of the proposed expressway system, being part of defendants' Exhibit 13, and marked Appendix A.

An order consistent with this memorandum will issue.

642

HOWARD, NEEDLES, TAMMEN & BERGENDORF
*Consulting Engineers*

PLAN OF PROJECT

LEGEND

SECTION ONE
REMAINING SECTIONS } RICHMOND EXPRESSWAY SYSTEM THE "PROJECT"
LOCAL ACCESS
MAINLINE TOLL PLAZA
INTERSTATE HIGHWAY SYSTEM
U.S. NUMBERED HIGHWAY
STATE PRIMARY HIGHWAY
SECONDARY ROADS AND STREETS
WIDENING OF CONNECTING FACILITIES NOW UNDER CONSTRUCTION
PROPOSED WIDENING

See accompanying text as to Downtown Expressway and Riverside Parkway.

Proposed Laburnum Ave Extension

FALLING CREEK INTERCHANGE

RICHMOND MUNICIPAL AIRPORT

Scale in Miles